# MIRANDA *v.* ARIZONA.

No. 759.   Argued February 28–March 1, 1966.—
Decided June 13, 1966.*

---

*Together with No. 760, *Vignera* v. *New York,* on certiorari to
the Court of Appeals of New York and No. 761, *Westover* v. *United
States,* on certiorari to the United States Court of Appeals for the
Ninth Circuit, both argued February 28–March 1, 1966; and No.
584, *California* v. *Stewart,* on certiorari to the Supreme Court of
California, argued February 28–March 2, 1966.

*John J. Flynn* argued the cause for petitioner in No. 759. With him on the brief was *John P. Frank.* *Victor M. Earle III* argued the cause and filed a brief for petitioner in No. 760. *F. Conger Fawcett* argued the cause. and filed a brief for petitioner in No. 761. *Gordon Ringer,* Deputy Attorney General of California, argued the cause for petitioner in No. 584. With him on the briefs were *Thomas C. Lynch,* Attorney General, and *William E. James,* Assistant Attorney General.

*Gary K. Nelson,* Assistant Attorney General of Arizona, argued the cause for respondent in No. 759. With him on the brief was *Darrell F. Smith,* Attorney General. *William I. Siegel* argued the cause for respondent in No. 760. With him on the brief was *Aaron E. Koota.* *Solicitor General Marshall* argued the cause for the United States in No. 761. With him on the brief were *Assistant Attorney General Vinson, Ralph S. Spritzer, Nathan Lewin, Beatrice Rosenberg* and *Ronald L. Gainer.* *William A. Norris,* by appointment of the Court, 382 U. S. 952, argued the cause and filed a brief for respondent in No. 584.

*Telford Taylor,* by special leave of Court, argued the cause for the State of New York, as *amicus curiae,* in all cases. With him on the brief were *Louis J. Lefkowitz,* Attorney General of New York, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Barry Mahoney* and *George D. Zuckerman,* Assistant Attorneys General, joined by the Attorneys General for their respective States and jurisdictions as follows: *Richmond M. Flowers* of Alabama, *Darrell F. Smith* of Arizona, *Bruce Bennett* of Arkansas, *Duke W. Dunbar* of Colorado, *David P. Buckson* of Delaware, *Earl Faircloth* of Florida, *Arthur K. Bolton* of Georgia, *Allan G. Shepard* of Idaho, *William G. Clark* of Illinois, *Robert C. Londerholm* of Kansas, *Robert Matthews* of Kentucky, *Jack P. F.*

*Gremillion* of Louisiana, *Richard J. Dubord* of Maine, *Thomas B. Finan* of Maryland, *Norman H. Anderson* of Missouri, *Forrest H. Anderson* of Montana, *Clarence A. H. Meyer* of Nebraska, *T. Wade Bruton* of North Carolina, *Helgi Johanneson* of North Dakota, *Robert Y. Thornton* of Oregon, *Walter E. Alessandroni* of Pennsylvania, *J. Joseph Nugent* of Rhode Island, *Daniel R. McLeod* of South Carolina, *Waggoner Carr* of Texas, *Robert Y. Button* of Virginia, *John J. O'Connell* of Washington, *C. Donald Robertson* of West Virginia, *John F. Raper* of Wyoming, *Rafael Hernandez Colon* of Puerto Rico and *Francisco Corneiro* of the Virgin Islands.

*Duane R. Nedrud,* by special leave of Court, argued the cause for the National District Attorneys Association, as *amicus curiae,* urging affirmance in Nos. 759 and 760, and reversal in No. 584. With him on the brief was *Marguerite D. Oberto.*

*Anthony G. Amsterdam, Paul J. Mishkin, Raymond L. Bradley, Peter Hearn* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union, as *amicus curiae,* in all cases.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The cases before us raise questions which go to the roots of our concepts of American criminal jurisprudence: the restraints society must observe consistent with the Federal Constitution in prosecuting individuals for crime. More specifically, we deal with the admissibility of statements obtained from an individual who is subjected to custodial police interrogation and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself.

We dealt with certain phases of this problem recently in *Escobedo* v. *Illinois,* 378 U. S. 478 (1964). There, as in the four cases before us, law enforcement officials took the defendant into custody and interrogated him in a police station for the purpose of obtaining a confession. The police did not effectively advise him of his right to remain silent or of his right to consult with his attorney. Rather, they confronted him with an alleged accomplice who accused him of having perpetrated a murder. When the defendant denied the accusation and said "I didn't shoot Manuel, you did it," they handcuffed him and took him to an interrogation room. There, while handcuffed and standing, he was questioned for four hours until he confessed. During this interrogation, the police denied his request to speak to his attorney, and they prevented his retained attorney, who had come to the police station, from consulting with him. At his trial, the State, over his objection, introduced the confession against him. We held that the statements thus made were constitutionally inadmissible.

This case has been the subject of judicial interpretation and spirited legal debate since it was decided two years ago. Both state and federal courts, in assessing its implications, have arrived at varying conclusions.[1] A wealth of scholarly material has been written tracing its ramifications and underpinnings.[2] Police and prose-

---

[1] Compare *United States* v. *Childress,* 347 F. 2d 448 (C. A. 7th Cir. 1965), with *Collins* v. *Beto,* 348 F. 2d 823 (C. A. 5th Cir. 1965). Compare *People* v. *Dorado,* 62 Cal. 2d 338, 398 P. 2d 361, 42 Cal. Rptr. 169 (1964) with *People* v. *Hartgraves,* 31 Ill. 2d 375, 202 N. E. 2d 33 (1964).

[2] See, *e. g.,* Enker & Elsen, Counsel for the Suspect: *Massiah* v. *United States* and *Escobedo* v. *Illinois,* 49 Minn. L. Rev. 47 (1964); Herman, The Supreme Court and Restrictions on Police Interrogation, 25 Ohio St. L. J. 449 (1964); Kamisar, Equal Justice in the Gatehouses and Mansions of American Criminal Procedure, in Criminal Justice in Our Time 1 (1965); Dowling, Escobedo and

cutor have speculated on its range and desirability.[3] We granted certiorari in these cases, 382 U. S. 924, 925, 937, in order further to explore some facets of the problems, thus exposed, of applying the privilege against self-incrimination to in-custody interrogation, and to give

Beyond: The Need for a Fourteenth Amendment Code of Criminal Procedure, 56 J. Crim. L., C. & P. S. 143, 156 (1965).

The complex problems also prompted discussions by jurists. Compare Bazelon, Law, Morality, and Civil Liberties, 12 U. C. L. A. L. Rev. 13 (1964), with Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929 (1965).

[3] For example, the Los Angeles Police Chief stated that "If the police are required . . . to . . . establish that the defendant was apprised of his constitutional guarantees of silence and legal counsel prior to the uttering of any admission or confession, and that he intelligently waived these guarantees . . . a whole Pandora's box is opened as to under what circumstances . . . can a defendant intelligently waive these rights. . . . ˙ Allegations that modern criminal investigation can compensate for the lack of a confession or admission in every criminal case is totally absurd!" Parker, 40 L. A. Bar Bull. 603, 607, 642 (1965). His prosecutorial counterpart, District Attorney Younger, stated that "[I]t begins to appear that many of these seemingly restrictive decisions are going to contribute directly to a more effective, efficient and professional level of law enforcement." L. A. Times, Oct. 2, 1965, p. 1. The former Police Commissioner of New York, Michael J. Murphy, stated of *Escobedo:* "What the Court is doing is akin to requiring one boxer to fight by Marquis of Queensbury rules while permitting the other to butt, gouge and bite." N. Y. Times, May 14, 1965, p. 39. The former United States Attorney for the District of Columbia, David C. Acheson, who is presently Special Assistant to the Secretary of the Treasury (for Enforcement), and directly in charge of the Secret Service and the Bureau of Narcotics, observed that "Prosecution procedure has, at most, only the most remote causal connection with crime. Changes in court decisions and prosecution procedure would have about the same effect on the crime rate as an aspirin would have on a tumor of the brain." Quoted in Herman, *supra,* n. 2, at 500, n. 270. Other views on the subject in general are collected in Weisberg, Police Interrogation of Arrested Persons: A Skeptical View, 52 J. Crim. L., C. & P. S. 21 (1961).

concrete constitutional guidelines for law enforcement agencies and courts to follow.

We start here, as we did in *Escobedo,* with the premise that our holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings. We have undertaken a thorough re-examination of the *Escobedo* decision and the principles it announced, and we reaffirm it. That case was but an explication of basic rights that are enshrined in our Constitution—that "No person . . . shall be compelled in any criminal case to be a witness against himself," and that "the accused shall . . . have the Assistance of Counsel"—rights which were put in jeopardy in that case through official overbearing. These precious rights were fixed in our Constitution only after centuries of persecution and struggle. And in the words of Chief Justice Marshall, they were secured "for ages to come, and . . . designed to approach immortality as nearly as human institutions can approach it," *Cohens* v. *Virginia,* 6 Wheat. 264, 387 (1821).

Over 70 years ago, our predecessors on this Court eloquently stated:

"The maxim *nemo tenetur seipsum accusare* had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which [have] long obtained in the continental system, and, until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, [were] not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the

questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably in those of Sir Nicholas Throckmorton, and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment." *Brown* v. *Walker,* 161 U. S. 591, 596–597 (1896).

In stating the obligation of the judiciary to apply these constitutional rights, this Court declared in *Weems* v. *United States,* 217 U. S. 349, 373 (1910):

". . . our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality. And this has been recognized. The

> meaning and vitality of the Constitution have developed against narrow and restrictive construction."

This was the spirit in which we delineated, in meaningful language, the manner in which the constitutional rights of the individual could be enforced against overzealous police practices. It was necessary in *Escobedo,* as here, to insure that what was proclaimed in the Constitution had not become but a "form of words," *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 392 (1920), in the hands of government officials. And it is in this spirit, consistent with our role as judges, that we adhere to the principles of *Escobedo* today.

Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4] As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the

---

[4] This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused.

process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

## I.

The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. In none of these cases was the defendant given a full and effective warning of his rights at the outset of the interrogation process. In all the cases, the questioning elicited oral admissions, and in three of them, signed statements as well which were admitted at their trials. They all thus share salient features—incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights.

An understanding of the nature and setting of this in-custody interrogation is essential to our decisions today. The difficulty in depicting what transpires at such interrogations stems from the fact that in this country they have largely taken place incommunicado. From extensive factual studies undertaken in the early 1930's, including the famous Wickersham Report to Congress by a Presidential Commission, it is clear that police violence and the "third degree" flourished at that time.[5]

---

[5] See, for example, IV. National Commission on Law Observance and Enforcement, Report on Lawlessness in Law Enforcement (1931)

In a series of cases decided by this Court long after these studies, the police resorted to physical brutality—beating, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions.[6] The Commission on Civil Rights in 1961 found much evidence to indicate that "some policemen still resort to physical force to obtain confessions," 1961 Comm'n on Civil Rights Rep., Justice, pt. 5, 17. The use of physical brutality and violence is not, unfortunately, relegated to the past or to any part of the country. Only recently in Kings County, New York, the police brutally beat, kicked and placed lighted cigarette butts on the back of a potential witness under interrogation for the purpose of securing a statement incriminating a third party. *People* v. *Portelli,* 15 N. Y. 2d 235, 205 N. E. 2d 857, 257 N. Y. S. 2d 931 (1965).[7]

[Wickersham Report]; Booth, Confessions, and Methods Employed in Procuring Them, 4 So. Calif. L. Rev. 83 (1930); Kauper, Judicial Examination of the Accused—A Remedy for the Third Degree, 30 Mich. L. Rev. 1224 (1932). It is significant that instances of third-degree treatment of prisoners almost invariably took place during the period between arrest and preliminary examination. Wickersham Report, at 169; Hall, The Law of Arrest in Relation to Contemporary Social Problems, 3 U. Chi. L. Rev. 345, 357 (1936). See also Foote, Law and Police Practice: Safeguards in the Law of Arrest, 52 Nw. U. L. Rev. 16 (1957).

[6] *Brown* v. *Mississippi,* 297 U. S. 278 (1936); *Chambers* v. *Florida,* 309 U. S. 227 (1940); *Canty* v. *Alabama,* 309 U. S. 629 (1940); *White* v. *Texas,* 310 U. S. 530 (1940); *Vernon* v. *Alabama,* 313 U. S. 547 (1941); *Ward* v. *Texas,* 316 U. S. 547 (1942); *Ashcraft* v. *Tennessee,* 322 U. S. 143 (1944); *Malinski* v. *New York,* 324 U. S. 401 (1945); *Leyra* v. *Denno,* 347 U. S. 556 (1954). See also *Williams* v. *United States,* 341 U. S. 97 (1951).

[7] In addition, see *People* v. *Wakat,* 415 Ill. 610, 114 N. E. 2d 706 (1953); *Wakat* v. *Harlib,* 253 F. 2d 59 (C. A. 7th Cir. 1958) (defendant suffering from broken bones, multiple bruises and injuries sufficiently serious to require eight months' medical treatment after being manhandled by five policemen); *Kier* v. *State,* 213 Md. 556, 132 A. 2d 494 (1957) (police doctor told accused, who was

The examples given above are undoubtedly the exception now, but they are sufficiently widespread to be the object of concern. Unless a proper limitation upon custodial interrogation is achieved—such as these decisions will advance—there can be no assurance that practices of this nature will be eradicated in the foreseeable future. The conclusion of the Wickersham Commission Report, made over 30 years ago, is still pertinent:

> "To the contention that the third degree is necessary to get the facts, the reporters aptly reply in the language of the present Lord Chancellor of England (Lord Sankey): 'It is not admissible to do a great right by doing a little wrong. . . . It is not sufficient to do justice by obtaining a proper result by irregular or improper means.' Not only does the use of the third degree involve a flagrant violation of law by the officers of the law, but it involves also the dangers of false confessions, and it tends to make police and prosecutors less zealous in the search for objective evidence. As the New York prosecutor quoted in the report said, 'It is a short cut and makes the police lazy and unenterprising.' Or, as another official quoted remarked: 'If you use your fists, you

strapped to a chair completely nude, that he proposed to take hair and skin scrapings from anything that looked like blood or sperm from various parts of his body); *Bruner* v. *People,* 113 Colo. 194, 156 P. 2d 111 (1945) (defendant held in custody over two months, deprived of food for 15 hours, forced to submit to a lie detector test when he wanted to go to the toilet); *People* v. *Matlock,* 51 Cal. 2d 682, 336 P. 2d 505 (1959) (defendant questioned incessantly over an evening's time, made to lie on cold board and to answer questions whenever it appeared he was getting sleepy). Other cases are documented in American Civil Liberties Union, Illinois Division, Secret Detention by the Chicago Police (1959); Potts, The Preliminary Examination and "The Third Degree," 2 Baylor L. Rev. 131 (1950); Sterling, Police Interrogation and the Psychology of Confession, 14 J. Pub. L. 25 (1965).

are not so likely to use your wits.' We agree with the conclusion expressed in the report, that 'The third degree brutalizes the police, hardens the prisoner against society, and lowers the esteem in which the administration of justice is held by the public.' " IV National Commission on Law Observance and Enforcement, Report on Lawlessness in Law Enforcement 5 (1931).

Again we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, "Since *Chambers* v. *Florida,* 309 U. S. 227, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn* v. *Alabama,* 361 U. S. 199, 206 (1960). Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms. A valuable source of information about present police practices, however, may be found in various police manuals and texts which document procedures employed with success in the past, and which recommend various other effective tactics.[8] These

---

[8] The manuals quoted in the text following are the most recent and representative of the texts currently available. Material of the same nature appears in Kidd, Police Interrogation (1940); Mulbar, Interrogation (1951); Dienstein, Technics for the Crime Investigator 97–115 (1952). Studies concerning the observed practices of the police appear in LaFave, Arrest: The Decision To Take a Suspect Into Custody 244–437, 490–521 (1965); LaFave, Detention for Investigation by the Police: An Analysis of Current Practices, 1962 Wash. U. L. Q. 331; Barrett, Police Practices and the Law—From Arrest to Release or Charge, 50 Calif. L. Rev. 11 (1962); Sterling, *supra,* n. 7, at 47–65.

texts are used by law enforcement agencies themselves as guides.[9] It should be noted that these texts professedly present the most enlightened and effective means presently used to obtain statements through custodial interrogation. By considering these texts and other data, it is possible to describe procedures observed and noted around the country.

The officers are told by the manuals that the "principal psychological factor contributing to a successful interrogation is *privacy*—being alone with the person under interrogation." [10] The efficacy of this tactic has been explained as follows:

> "If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and

[9] The methods described in Inbau & Reid, Criminal Interrogation and Confessions (1962), are a revision and enlargement of material presented in three prior editions of a predecessor text, Lie Detection and Criminal Interrogation (3d ed. 1953). The authors and their associates are officers of the Chicago Police Scientific Crime Detection Laboratory and have had extensive experience in writing, lecturing and speaking to law enforcement authorities over a 20-year period. They say that the techniques portrayed in their manuals reflect their experiences and are the most effective psychological stratagems to employ during interrogations. Similarly, the techniques described in O'Hara, Fundamentals of Criminal Investigation (1956), were gleaned from long service as observer, lecturer in police science, and work as a federal criminal investigator. All these texts have had rather extensive use among law enforcement agencies and among students of police science, with total sales and circulation of over 44,000.

[10] Inbau & Reid, Criminal Interrogation and Confessions (1962), at 1.

more reluctant to tell of his indiscretions or criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his own office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law." [11]

To highlight the isolation and unfamiliar surroundings, the manuals instruct the police to display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details. The guilt of the subject is to be posited as a fact. The interrogator should direct his comments toward the reasons why the subject committed the act, rather than court failure by asking the subject whether he did it. Like other men, perhaps the subject has had a bad family life, had an unhappy childhood, had too much to drink, had an unrequited desire for women. The officers are instructed to minimize the moral seriousness of the offense,[12] to cast blame on the victim or on society.[13] These tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already— that he is guilty. Explanations to the contrary are dismissed and discouraged.

The texts thus stress that the major qualities an interrogator should possess are patience and perseverance.

---

[11] O'Hara, *supra*, at 99.

[12] Inbau & Reid, *supra*, at 34–43, 87. For example, in *Leyra* v. *Denno*, 347 U. S. 556 (1954), the interrogator-psychiatrist told the accused, "We do sometimes things that are not right, but in a fit of temper or anger we sometimes do things we aren't really responsible for," *id.*, at 562, and again, "We know that morally you were just in anger. Morally, you are not to be condemned," *id.*, at 582.

[13] Inbau & Reid, *supra*, at 43–55.

One writer describes the efficacy of these characteristics in this manner:

"In the preceding paragraphs emphasis has been placed on kindness and stratagems. The investigator will, however, encounter many situations where the sheer weight of his personality will be the deciding factor. Where emotional appeals and tricks are employed to no avail, he must rely on an oppressive atmosphere of dogged persistence. He must interrogate steadily and without relent, leaving the subject no prospect of surcease. He must dominate his subject and overwhelm him with his inexorable will to obtain the truth. He should interrogate for a spell of several hours pausing only for the subject's necessities in acknowledgment of the need to avoid a charge of duress that can be technically substantiated. In a serious case, the interrogation may continue for days, with the required intervals for food and sleep, but with no respite from the atmosphere of domination. It is possible in this way to induce the subject to talk without resorting to duress or coercion. The method should be used only when the guilt of the subject appears highly probable." [14]

The manuals suggest that the suspect be offered legal excuses for his actions in order to obtain an initial admission of guilt. Where there is a suspected revenge-killing, for example, the interrogator may say:

"Joe, you probably didn't go out looking for this fellow with the purpose of shooting him. My guess is, however, that you expected something from him and that's why you carried a gun—for your own protection. You knew him for what he was, no good. Then when you met him he probably started using foul, abusive language and he gave some indi-

---

[14] O'Hara, *supra,* at 112.

cation that he was about to pull a gun on you, and that's when you had to act to save your own life. That's about it, isn't it, Joe?" [15]

Having then obtained the admission of shooting, the interrogator is advised to refer to circumstantial evidence which negates the self-defense explanation. This should enable him to secure the entire story. One text notes that "Even if he fails to do so, the inconsistency between the subject's original denial of the shooting and his present admission of at least doing the shooting will serve to deprive him of a self-defense 'out' at the time of trial." [16]

When the techniques described above prove unavailing, the texts recommend they be alternated with a show of some hostility. One ploy often used has been termed the "friendly-unfriendly" or the "Mutt and Jeff" act:

". . . In this technique, two agents are employed. Mutt, the relentless investigator, who knows the subject is guilty and is not going to waste any time. He's sent a dozen men away for this crime and he's going to send the subject away for the full term. Jeff, on the other hand, is obviously a kindhearted man. He has a family himself. He has a brother who was involved in a little scrape like this. He disapproves of Mutt and his tactics and will arrange to get him off the case if the subject will cooperate. He can't hold Mutt off for very long. The subject would be wise to make a quick decision. The technique is applied by having both investigators present while Mutt acts out his role. Jeff may stand by quietly and demur at some of Mutt's tactics. When Jeff makes his plea for cooperation, Mutt is not present in the room." [17]

---

[15] Inbau & Reid, *supra,* at 40.

[16] *Ibid.*

[17] O'Hara, *supra,* at 104, Inbau & Reid, *supra,* at 58–59. See *Spano v. New York,* 360 U. S. 315 (1959). A variant on the tech-

The interrogators sometimes are instructed to induce a confession out of trickery. The technique here is quite effective in crimes which require identification or which run in series. In the identification situation, the interrogator may take a break in his questioning to place the subject among a group of men in a line-up. "The witness or complainant (previously coached, if necessary) studies the line-up and confidently points out the subject as the guilty party." [18] Then the questioning resumes "as though there were now no doubt about the guilt of the subject." A variation on this technique is called the "reverse line-up":

> "The accused is placed in a line-up, but this time he is identified by several fictitious witnesses or victims who associated him with different offenses. It is expected that the subject will become desperate and confess to the offense under investigation in order to escape from the false accusations." [19]

The manuals also contain instructions for police on how to handle the individual who refuses to discuss the matter entirely, or who asks for an attorney or relatives. The examiner is to concede him the right to remain silent. "This usually has a very undermining effect. First of all, he is disappointed in his expectation of an unfavorable reaction on the part of the interrogator. Secondly, a concession of this right to remain silent im-

nique of creating hostility is one of engendering fear. This is perhaps best described by the prosecuting attorney in *Malinski* v. *New York*, 324 U. S. 401, 407 (1945): "Why this talk about being undressed? Of course, they had a right to undress him to look for bullet scars, and keep the clothes off him. That was quite proper police procedure. That is some more psychology—let him sit around with a blanket on him, humiliate him there for a while; let him sit in the corner, let him think he is going to get a shellacking."

[18] O'Hara, *supra*, at 105–106.

[19] *Id.*, at 106.

presses the subject with the apparent fairness of his interrogator." [20] After this psychological conditioning, however, the officer is told to point out the incriminating significance of the suspect's refusal to talk:

> "Joe, you have a right to remain silent. That's your privilege and I'm the last person in the world who'll try to take it away from you. If that's the way you want to leave this, O. K. But let me ask you this. Suppose you were in my shoes and I were in yours and you called me in to ask me about this and I told you, 'I don't want to answer any of your questions.' You'd think I had something to hide, and you'd probably be right in thinking that. That's exactly what I'll have to think about you, and so will everybody else. So let's sit here and talk this whole thing over." [21]

Few will persist in their initial refusal to talk, it is said, if this monologue is employed correctly.

In the event that the subject wishes to speak to a relative or an attorney, the following advice is tendered:

> "[T]he interrogator should respond by suggesting that the subject first tell the truth to the interrogator himself rather than get anyone else involved in the matter. If the request is for an attorney, the interrogator may suggest that the subject save himself or his family the expense of any such professional service, particularly if he is innocent of the offense under investigation. The interrogator may also add, 'Joe, I'm only looking for the truth, and if you're telling the truth, that's it. You can handle this by yourself.' " [22]

---

[20] Inbau & Reid, *supra,* at 111.
[21] *Ibid.*
[22] Inbau & Reid, *supra,* at 112.

From these representative samples of interrogation techniques, the setting prescribed by the manuals and observed in practice becomes clear. In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must "patiently maneuver himself or his quarry into a position from which the desired objective may be attained." [23] When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.

Even without employing brutality, the "third degree" or the specific stratagems described above, the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals.[24]

---

[23] Inbau & Reid, Lie Detection and Criminal Interrogation 185 (3d ed. 1953).

[24] Interrogation procedures may even give rise to a false confession. The most recent conspicuous example occurred in New York, in 1964, when a Negro of limited intelligence confessed to two brutal murders and a rape which he had not committed. When this was discovered, the prosecutor was reported as saying: "Call it what you want—brain-washing, hypnosis, fright. They made him give an untrue confession. The only thing I don't believe is that Whitmore was beaten." N. Y. Times, Jan. 28, 1965, p. 1, col. 5. In two other instances, similar events had occurred. N. Y. Times, Oct. 20, 1964, p. 22, col. 1; N. Y. Times, Aug. 25, 1965, p. 1, col. 1. In general, see Borchard, Convicting the Innocent (1932); Frank & Frank, Not Guilty (1957).

This fact may be illustrated simply by referring to three confession cases decided by this Court in the Term immediately preceding our *Escobedo* decision. In *Townsend* v. *Sain*, 372 U. S. 293 (1963), the defendant was a 19-year-old heroin addict, described as a "near mental defective," *id.*, at 307–310. The defendant in *Lynumn* v. *Illinois*, 372 U. S. 528 (1963), was a woman who confessed to the arresting officer after being importuned to "cooperate" in order to prevent her children from being taken by relief authorities. This Court as in those cases reversed the conviction of a defendant in *Haynes* v. *Washington*, 373 U. S. 503 (1963), whose persistent request during his interrogation was to phone his wife or attorney.[25] In other settings, these individuals might have exercised their constitutional rights. In the incommunicado police-dominated atmosphere, they succumbed.

In the cases before us today, given this background, we concern ourselves primarily with this interrogation atmosphere and the evils it can bring. In No. 759, *Miranda* v. *Arizona,* the police arrested the defendant and took him to a special interrogation room where they secured a confession. In No. 760, *Vignera* v. *New York,* the defendant made oral admissions to the police after interrogation in the afternoon, and then signed an inculpatory statement upon being questioned by an assistant district attorney later the same evening. In No. 761, *Westover* v. *United States,* the defendant was handed over to the Federal Bureau of Investigation by

---

[25] In the fourth confession case decided by the Court in the 1962 Term, *Fay* v. *Noia*, 372 U. S. 391 (1963), our disposition made it unnecessary to delve at length into the facts. The facts of the defendant's case there, however, paralleled those of his co-defendants, whose confessions were found to have resulted from continuous and coercive interrogation for 27 hours, with denial of requests for friends or attorney   See *United States* v. *Murphy*, 222 F. 2d 698 (C. A. 2d Cir. 1955) (Frank, J.); *People* v. *Bonino*, 1 N. Y. 2d 752, 135 N. E. 2d 51 (1956).

local authorities after they had detained and interrogated him for a lengthy period, both at night and the following morning. After some two hours of questioning, the federal officers had obtained signed statements from the defendant. Lastly, in No. 584, *California* v. *Stewart,* the local police held the defendant five days in the station and interrogated him on nine separate occasions before ·they secured his inculpatory statement.

In these cases, we might not find the defendants' statements to have been involuntary in traditional terms. Our concern for adequate safeguards to protect precious Fifth Amendment rights is, of course, not lessened in the slightest. In each of the cases, the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures. The potentiality for compulsion is forcefully apparent, for example, in *Miranda,* where the indigent Mexican defendant was a seriously disturbed individual with pronounced sexual fantasies, and in *Stewart,* in which the defendant was an indigent Los Angeles Negro who had dropped out of school in the sixth grade. To be sure, the records do not evince overt physical coercion or patent psychological ploys. The fact remains that in none of these cases did the officers undertake to afford appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice.

It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity.[26] The current practice of incommunicado interrogation is at odds with one of our

---

[26] The absurdity of denying that a confession obtained under these circumstances is compelled is aptly portrayed by an example in Pro-

Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.

From the foregoing, we can readily perceive an intimate connection between the privilege against self-incrimination and police custodial questioning. It is fitting to turn to history and precedent underlying the Self-Incrimination Clause to determine its applicability in this situation.

## II.

We sometimes forget how long it has taken to establish the privilege against self-incrimination, the sources from which it came and the fervor with which it was defended. Its roots go back into ancient times.[27] Per-

---

fessor Sutherland's recent article, Crime and Confession, 79 Harv. L. Rev. 21, 37 (1965):

"Suppose a well-to-do testatrix says she intends to will her property to Elizabeth. John and James want her to bequeath it to them instead. They capture the testatrix, put her in a carefully designed room, out of touch with everyone but themselves and their convenient 'witnesses,' keep her secluded there for hours while they make insistent demands, weary her with contradictions of her assertions that she wants to leave her money to Elizabeth, and finally induce her to execute the will in their favor. Assume that John and James are deeply and correctly convinced that Elizabeth is unworthy and will make base use of the property if she gets her hands on it, whereas John and James have the noblest and most righteous intentions. Would any judge of probate accept the will so procured as the 'voluntary' act of the testatrix?"

[27] Thirteenth century commentators found an analogue to the privilege grounded in the Bible. "To sum up the matter, the principle that no man is to be declared guilty on his own admission is a divine decree." Maimonides, Mishneh Torah (Code of Jewish Law), Book of Judges, Laws of the Sanhedrin, c. 18, ¶ 6, III Yale Judaica Series 52–53. See also Lamm, The Fifth Amendment and Its Equivalent in the Halakhah, 5 Judaism 53 (Winter 1956).

haps the critical historical event shedding light on its origins and evolution was the trial of one John Lilburn, a vocal anti-Stuart Leveller, who was made to take the Star Chamber Oath in 1637. The oath would have bound him to answer to all questions posed to him on any subject. The Trial of John Lilburn and John Wharton, 3 How. St. Tr. 1315 (1637). He resisted the oath and declaimed the proceedings, stating:

> "Another fundamental right I then contended for, was, that no man's conscience ought to be racked by oaths imposed, to answer to questions concerning himself in matters criminal, or pretended to be so." Haller & Davies, The Leveller Tracts 1647–1653, p. 454 (1944).

On account of the Lilburn Trial, Parliament abolished the inquisitorial Court of Star Chamber and went further in giving him generous reparation. The lofty principles to which Lilburn had appealed during his trial gained popular acceptance in England.[28] These sentiments worked their way over to the Colonies and were implanted after great struggle into the Bill of Rights.[29] Those who framed our Constitution and the Bill of Rights were ever aware of subtle encroachments on individual liberty. They knew that "illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." *Boyd* v. *United States,* 116 U. S. 616, 635 (1886). The privilege was elevated to constitutional status and has always been "as broad as the mischief

---

[28] See Morgan, The Privilege Against Self-Incrimination, 34 Minn. L. Rev. 1, 9–11 (1949); 8 Wigmore, Evidence 289–295 (McNaughton rev. 1961). See also Lowell, The Judicial Use of Torture, Parts I and II, 11 Harv. L. Rev. 220, 290 (1897).

[29] See Pittman, The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America, 21 Va. L. Rev. 763 (1935); *Ullmann* v. *United States,* 350 U. S. 422, 445–449 (1956) (DOUGLAS, J., dissenting).

against which it seeks to guard." *Counselman* v. *Hitchcock,* 142 U. S. 547, 562 (1892). We cannot depart from this noble heritage.

Thus we may view the historical development of the privilege as one which groped for the proper scope of governmental power over the citizen. As a "noble principle often transcends its origins," the privilege has come rightfully to be recognized in part as an individual's substantive right, a "right to a private enclave where he may lead a private life. That right is the hallmark of our democracy." *United States* v. *Grunewald,* 233 F. 2d 556, 579, 581–582 (Frank, J., dissenting), rev'd, 353 U. S. 391 (1957). We have recently noted that the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values, *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55–57, n. 5 (1964); *Tehan* v. *Shott,* 382 U. S. 406, 414–415, n. 12 (1966). All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. *Chambers* v. *Florida,* 309 U. S. 227, 235–238 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Malloy* v. *Hogan,* 378 U. S. 1, 8 (1964).

The question in these cases is whether the privilege is fully applicable during a period of custodial interroga-

tion. In this Court, the privilege has consistently been accorded a liberal construction. *Albertson* v. *SACB,* 382 U. S. 70, 81 (1965); *Hoffman* v. *United States,* 341 U. S. 479, 486 (1951); *Arndstein* v. *McCarthy,* 254 U. S. 71, 72–73 (1920); *Counselman* v. *Hitchock,* 142 U. S. 547, 562 (1892). We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.[30]

This question, in fact, could have been taken as settled in federal courts almost 70 years ago, when, in *Bram* v. *United States,* 168 U. S. 532, 542 (1897), this Court held:

> "In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself.' "

In *Bram,* the Court reviewed the British and American history and case law and set down the Fifth Amendment standard for compulsion which we implement today:

> "Much of the confusion which has resulted from the effort to deduce from the adjudged cases what

---

[30] Compare *Brown* v. *Walker,* 161 U. S. 591 (1896); *Quinn* v. *United States,* 349 U. S. 155 (1955).

would be a sufficient quantum of proof to show that a confession was or was not voluntary, has arisen from a misconception of the subject to which the proof must address itself. The rule is not that in order to render a statement admissible the proof must be adequate to establish that the particular communications contained in a statement were voluntarily made, but it must be sufficient to establish that the making of the statement was voluntary; that is to say, that from the causes, which the law treats as legally sufficient to engender in the mind of the accused hope or fear in respect to the crime charged, the accused was not involuntarily impelled to make a statement, when but for the improper influences he would have remained silent. . . ." 168 U. S., at 549. And see, *id.*, at 542.

The Court has adhered to this reasoning. In 1924, Mr. Justice Brandeis wrote for a unanimous Court in reversing a conviction resting on a compelled confession, *Wan* v. *United States,* 266 U. S. 1. He stated:

"In the federal courts, the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was, in fact, voluntarily made. A confession may have been given voluntarily, although it was made to police officers, while in custody, and in answer to an examination conducted by them. But a confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise. *Bram* v. *United States,* 168 U. S. 532." 266 U. S., at 14–15.

In addition to the expansive historical development of the privilege and the sound policies which have nurtured

its evolution, judicial precedent thus clearly establishes its application to incommunicado interrogation. In fact, the Government concedes this point as well established in No. 761, *Westover* v. *United States,* stating: "We have no doubt . . . that it is possible for a suspect's Fifth Amendment right to be violated during in-custody questioning by a law-enforcement officer." [31]

Because of the adoption by Congress of Rule 5 (a) of the Federal Rules of Criminal Procedure, and this Court's effectuation of that Rule in *McNabb* v. *United States,* 318 U. S. 332 (1943), and *Mallory* v. *United States,* 354 U. S. 449 (1957), we have had little occasion in the past quarter century to reach the constitutional issues in dealing with federal interrogations. These supervisory rules, requiring production of an arrested person before a commissioner "without unnecessary delay" and excluding evidence obtained in default of that statutory obligation, were nonetheless responsive to the same considerations of Fifth Amendment policy that unavoidably face us now as to the States. In *McNabb,* 318 U. S., at 343–344, and in *Mallory,* 354 U. S., at 455–456, we recognized both the dangers of interrogation and the appropriateness of prophylaxis stemming from the very fact of interrogation itself.[32]

Our decision in *Malloy* v. *Hogan,* 378 U. S. 1 (1964), necessitates an examination of the scope of the privilege in state cases as well. In *Malloy,* we squarely held the

---

[31] Brief for the United States, p. 28. To the same effect, see Brief for the United States, pp. 40–49, n. 44, *Anderson* v. *United States,* 318 U. S. 350 (1943); Brief for the United States, pp. 17–18, *McNabb* v. *United States,* 318 U. S. 332 (1943).

[32] Our decision today does not indicate in any manner, of course, that these rules can be disregarded. When federal officials arrest an individual, they must as always comply with the dictates of the congressional legislation and cases thereunder. See generally, Hogan & Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo. L. J. 1 (1958).

privilege applicable to the States, and held that the substantive standards underlying the privilege applied with full force to state court proceedings. There, as in *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52 (1964), and *Griffin* v. *California,* 380 U. S. 609 (1965), we applied the existing Fifth Amendment standards to the case before us. Aside from the holding itself, the reasoning in *Malloy* made clear what had already become apparent—that the substantive and procedural safeguards surrounding admissibility of confessions in state cases had become exceedingly exacting, reflecting all the policies embedded in the privilege, 378 U. S., at 7–8.[33] The voluntariness doctrine in the state cases, as *Malloy* indicates, encompasses all interrogation practices which are likely to exert such pressure upon an individual as to disable him from

---

[33] The decisions of this Court have guaranteed the same procedural protection for the defendant whether his confession was used in a federal or state court. It is now axiomatic that the defendant's constitutional rights have been violated if his conviction is based, in whole or in part, on an involuntary confession, regardless of its truth or falsity. *Rogers* v. *Richmond,* 365 U. S. 534, 544 (1961); *Wan* v. *United States,* 266 U. S. 1 (1924). This is so even if there is ample evidence aside from the confession to support the conviction, *e. g., Malinski* v. *New York,* 324 U. S. 401, 404 (1945); *Bram* v. *United States,* 168 U. S. 532, 540–542 (1897). Both state and federal courts now adhere to trial procedures which seek to assure a reliable and clear-cut determination of the voluntariness of the confession offered at trial, *Jackson* v. *Denno,* 378 U. S. 368 (1964); *United States* v. *Carignan,* 342 U. S. 36, 38 (1951); see also *Wilson* v. *United States,* 162 U. S. 613, 624 (1896). Appellate review is exacting, see *Haynes* v. *Washington,* 373 U. S. 503 (1963); *Blackburn* v. *Alabama,* 361 U. S. 199 (1960). Whether his conviction was in a federal or state court, the defendant may secure a post-conviction hearing based on the alleged involuntary character of his confession, provided he meets the procedural requirements, *Fay* v. *Noia,* 372 U. S. 391 (1963); *Townsend* v. *Sain,* 372 U. S. 293 (1963). In addition, see *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52 (1964).

making a free and rational choice.[34]   The implications of this proposition were elaborated in our decision in *Escobedo* v. *Illinois,* 378 U. S. 478, decided one week after *Malloy* applied the privilege to the States.

Our holding there stressed the fact that the police had not advised the defendant of his constitutional privilege to remain silent at the outset of the interrogation, and we drew attention to that fact at several points in the decision, 378 U. S., at 483, 485, 491.   This was no isolated factor, but an essential ingredient in our decision.   The entire thrust of police interrogation there, as in all the cases today, was to put the defendant in such an emotional state as to impair his capacity for rational judgment.   The abdication of the constitutional privilege— the choice on his part to speak to the police—was not made knowingly or competently because of the failure to apprise him of his rights; the compelling atmosphere of the in-custody interrogation, and not an independent decision on his part, caused the defendant to speak.

A different phase of the *Escobedo* decision was significant in its attention to the absence of counsel during the questioning.   There, as in the cases today, we sought a protective device to dispel the compelling atmosphere of the interrogation.   In *Escobedo,* however, the police did not relieve the defendant of the anxieties which they had created in the interrogation rooms.   Rather, they denied his request for the assistance of counsel, 378 U. S., at 481, 488, 491.[35]   This heightened his dilemma, and

---

[34] See *Lisenba* v. *California,* 314 U. S. 219, 241 (1941); *Ashcraft* v. *Tennessee,* 322 U. S. 143 (1944); *Malinski* v. *New York,* 324 U. S. 401 (1945); *Spano* v. *New York,* 360 U. S. 315 (1959); *Lynumn* v. *Illinois,* 372 U. S. 528 (1963); *Haynes* v. *Washington,* 373 U. S. 503 (1963).

[35] The police also prevented the attorney from consulting with his client.   Independent of any other constitutional proscription, this action constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its

made his later statements the product of this compulsion. Cf. *Haynes* v. *Washington,* 373 U. S. 503, 514 (1963). The denial of the defendant's request for his attorney thus undermined his ability to exercise the privilege— to remain silent if he chose or to speak without any intimidation, blatant or subtle. The presence of counsel, in all the cases before us today, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion.

It was in this manner that *Escobedo* explicated another facet of the pre-trial privilege, noted in many of the Court's prior decisions: the protection of rights at trial.[36] That counsel is present when statements are taken from an individual during interrogation obviously enhances the integrity of the fact-finding processes in court. The presence of an attorney, and the warnings delivered to the individual, enable the defendant under otherwise compelling circumstances to tell his story without fear, effectively, and in a way that eliminates the evils in the interrogation process. Without the protections flowing from adequate warnings and the rights of counsel, "all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police." *Mapp* v. *Ohio,* 367 U. S. 643, 685 (1961) (HARLAN, J., dissenting). Cf. *Pointer* v. *Texas,* 380 U. S. 400 (1965).

---

wake. See *People* v. *Donovan,* 13 N. Y. 2d 148, 193 N. E. 2d 628, 243 N. Y. S. 2d 841 (1963) (Fuld, J.).

[36] *In re Groban,* 352 U. S. 330, 340–352 (1957) (BLACK, J., dissenting); Note, 73 Yale L. J. 1000, 1048–1051 (1964); Comment, 31 U. Chi. L. Rev. 313, 320 (1964) and authorities cited.

## III.

Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws. However, unless we are shown other procedures which are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it, the following safeguards must be observed.

At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and

unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained or that silence in the face of accusation is itself damning and will bode ill when presented to a jury.[37] Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it.

The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on infor-

---

[37] See p. 454, *supra.* Lord Devlin has commented:

"It is probable that even today, when there is much less ignorance about these matters than formerly, there is still a general belief that you must answer all questions put to you by a policeman, or at least that it will be the worse for you if you do not." Devlin, The Criminal Prosecution in England 32 (1958).

In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation. Cf. *Griffin* v. *California,* 380 U. S. 609 (1965); *Malloy* v. *Hogan,* 378 U. S. 1, 8 (1964); Comment, 31 U. Chi. L. Rev. 556 (1964); Developments in the Law—Confessions, 79 Harv. L. Rev. 935, 1041–1044 (1966). See also *Bram* v. *United States,* 168 U. S. 532, 562 (1897).

mation as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; [38] a warning is a clearcut fact. More important, whatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time.

The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.

The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere

---

[38] Cf. *Betts* v. *Brady*, 316 U. S. 455 (1942), and the recurrent inquiry into special circumstances it necessitated. See generally, Kamisar, *Betts* v. *Brady* Twenty Years Later: The Right to Counsel and Due Process Values, 61 Mich. L. Rev. 219 (1962).

warning given by the interrogators is not alone sufficient to accomplish that end. Prosecutors themselves claim that the admonishment of the right to remain silent without more "will benefit only the recidivist and the professional." Brief for the National District Attorneys Association as *amicus curiae*, p. 14. Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Cf. *Escobedo* v. *Illinois,* 378 U. S. 478, 485, n. 5. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.

The presence of counsel at the interrogation may serve several significant subsidiary functions as well. If the accused decides to talk to his interrogators, the assistance of counsel can mitigate the dangers of untrustworthiness. With a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court. The presence of a lawyer can also help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial. See *Crooker* v. *California,* 357 U. S. 433, 443–448 (1958) (DOUGLAS, J., dissenting).

An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given. The accused who does not know his rights and therefore does not make a request

may be the person who most needs counsel. As the California Supreme Court has aptly put it:

"Finally, we must recognize that the imposition of the requirement for the request would discriminate against the defendant who does not know his rights. The defendant who does not ask for counsel is the very defendant who most needs counsel. We cannot penalize a defendant who, not understanding his constitutional rights, does not make the formal request and by such failure demonstrates his helplessness. To require the request would be to favor the defendant whose sophistication or status had fortuitously prompted him to make it." *People* v. *Dorado,* 62 Cal. 2d 338, 351, 398 P. 2d 361, 369–370, 42 Cal. Rptr. 169, 177–178 (1965) (Tobriner, J.).

In *Carnley* v. *Cochran,* 369 U. S. 506, 513 (1962), we stated: "[I]t is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request." This proposition applies with equal force in the context of providing counsel to protect an accused's Fifth Amendment privilege in the face of interrogation.[39] Although the role of counsel at trial differs from the role during interrogation, the differences are not relevant to the question whether a request is a prerequisite.

Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. No amount of

---

[39] See Herman, The Supreme Court and Restrictions on Police Interrogation, 25 Ohio St. L. J. 449, 480 (1964).

circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead. Only through such a warning is there ascertainable assurance that the accused was aware of this right.

If an individual indicates that he wishes the assistance of counsel before any interrogation occurs, the authorities cannot rationally ignore or deny his request on the basis that the individual does not have or cannot afford a retained attorney. The financial ability of the individual has no relationship to the scope of the rights involved here. The privilege against self-incrimination secured by the Constitution applies to all individuals. The need for counsel in order to protect the privilege exists for the indigent as well as the affluent. In fact, were we to limit these constitutional rights to those who can retain an attorney, our decisions today would be of little significance. The cases before us as well as the vast majority of confession cases with which we have dealt in the past involve those unable to retain counsel.[40] While authorities are not required to relieve the accused of his poverty, they have the obligation not to take advantage of indigence in the administration of justice.[41] Denial

---

[40] Estimates of 50–90% indigency among felony defendants have been reported. Pollock, Equal Justice in Practice, 45 Minn. L. Rev. 737, 738–739 (1961); Birzon, Kasanof & Forma, The Right to Counsel and the Indigent Accused in Courts of Criminal Jurisdiction in New York State, 14 Buffalo L. Rev. 428, 433 (1965).

[41] See Kamisar, Equal Justice in the Gatehouses and Mansions of American Criminal Procedure, in Criminal Justice in Our Time 1, 64–81 (1965). As was stated in the Report of the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice 9 (1963):

"When government chooses to exert its powers in the criminal area, its obligation is surely no less than that of taking reasonable measures to eliminate those factors that are irrelevant to just administration of the law but which, nevertheless, may occasionally affect determinations of the accused's liability or penalty. While govern-

of counsel to the indigent at the time of interrogation while allowing an attorney to those who can afford one would be no more supportable by reason or logic than the similar situation at trial and on appeal struck down in *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), and *Douglas* v. *California,* 372 U. S. 353 (1963).

In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present.[42] As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.[43]

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any man-

ment may not be required to relieve the accused of his poverty, it may properly be required to minimize the influence of poverty on its administration of justice."

[42] Cf. *United States ex rel. Brown* v. *Fay,* 242 F. Supp. 273, 277 (D. C. S. D. N. Y. 1965); *People* v. *Witenski,* 15 N. Y. 2d 392, 207 N. E. 2d 358, 259 N. Y. S. 2d 413 (1965).

[43] While a warning that the indigent may have counsel appointed need not be given to the person who is known to have an attorney or is known to have ample funds to secure one, the expedient of giving a warning is too simple and the rights involved too important to engage in *ex post facto* inquiries into financial ability when there is any doubt at all on that score.

ner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.[44] At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

This does not mean, as some have suggested, that each police station must have a "station house lawyer" present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time.

---

[44] If an individual indicates his desire to remain silent, but has an attorney present, there may be some circumstances in which further questioning would be permissible. In the absence of evidence of overbearing, statements then made in the presence of counsel might be free of the compelling influence of the interrogation process and might fairly be construed as a waiver of the privilege for purposes of these statements.

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo* v. *Illinois,* 378 U. S. 478, 490, n. 14. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson* v. *Zerbst,* 304 U. S. 458 (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in *Carnley* v. *Cochran,* 369 U. S. 506, 516 (1962), is applicable here:

> "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

See also *Glasser* v. *United States,* 315 U. S. 60 (1942). Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives

some information on his own prior to invoking his right to remain silent when interrogated.[45]

Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.

The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Sim-

---

[45] Although this Court held in *Rogers* v. *United States,* 340 U. S. 367 (1951), over strong dissent, that a witness before a grand jury may not in certain circumstances decide to answer some questions and then refuse to answer others, that decision has no application to the interrogation situation we deal with today. No legislative or judicial fact-finding authority is involved here, nor is there a possibility that the individual might make self-serving statements of which he could make use at trial while refusing to answer incriminating statements.

ilarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement. In *Escobedo* itself, the defendant fully intended his accusation of another as the slayer to be exculpatory as to himself.

The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way. It is at this point that our adversary system of criminal proceedings commences, distinguishing itself at the outset from the inquisitorial system recognized in some countries. Under the system of warnings we delineate today or under any other system which may be devised and found effective, the safeguards to be erected about the privilege must come into play at this point.

Our decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo* v. *Illinois,* 378 U. S. 478, 492. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of

responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.[46]

In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime,[47] or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to

---

[46] The distinction and its significance has been aptly described in the opinion of a Scottish court:

"In former times such questioning, if undertaken, would be conducted by police officers visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient the modern practice may be, it must normally create a situation very unfavourable to the suspect." *Chalmers* v. *H. M. Advocate,* [1954] Sess. Cas. 66, 78 (J. C.).

[47] See *People* v. *Dorado,* 62 Cal. 2d 338, 354, 398 P. 2d 361, 371, 42 Cal. Rptr. 169, 179 (1965).

protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.[48]

## IV.

A recurrent argument made in these cases is that society's need for interrogation outweighs the privilege. This argument is not unfamiliar to this Court. See, e. g., *Chambers* v. *Florida,* 309 U. S. 227, 240–241 (1940). The whole thrust of our foregoing discussion demonstrates that the Constitution has prescribed the rights of the individual when confronted with the power of government when it provided in the Fifth Amendment that an individual cannot be compelled to be a witness against himself. That right cannot be abridged. As Mr. Justice Brandeis once observed:

"Decency, security and liberty alike demand that government officials shall be subjected to the same

---

[48] In accordance with our holdings today and in *Escobedo* v. *Illinois,* 378 U. S. 478, 492, *Crooker* v. *California,* 357 U. S. 433 (1958) and *Cicenia* v. *Lagay,* 357 U. S. 504 (1958) are not to be followed.

rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face." *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928) (dissenting opinion).[49]

In this connection, one of our country's distinguished jurists has pointed out: "The quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law." [50]

If the individual desires to exercise his privilege, he has the right to do so. This is not for the authorities to decide. An attorney may advise his client not to talk to police until he has had an opportunity to investigate the case, or he may wish to be present with his client during any police questioning. In doing so an attorney is merely exercising the good professional judgment he has been taught. This is not cause for considering the attorney a menace to law enforcement. He is merely carrying out what he is sworn to do under his oath— to protect to the extent of his ability the rights of his

---

[49] In quoting the above from the dissenting opinion of Mr. Justice Brandeis we, of course, do not intend to pass on the constitutional questions involved in the *Olmstead* case.

[50] Schaefer, Federalism and State Criminal Procedure, 70 Harv. L. Rev. 1, 26 (1956).

client. In fulfilling this responsibility the attorney plays a vital role in the administration of criminal justice under our Constitution.

In announcing these principles, we are not unmindful of the burdens which law enforcement officials must bear, often under trying circumstances. We also fully recognize the obligation of all citizens to aid in enforcing the criminal laws. This Court, while protecting individual rights, has always given ample latitude to law enforcement agencies in the legitimate exercise of their duties. The limits we have placed on the interrogation process should not constitute an undue interference with a proper system of law enforcement. As we have noted, our decision does not in any way preclude police from carrying out their traditional investigatory functions. Although confessions may play an important role in some convictions, the cases before us present graphic examples of the overstatement of the "need" for confessions. In each case authorities conducted interrogations ranging up to five days in duration despite the presence, through standard investigating practices, of considerable evidence against each defendant.[51] Further examples are chronicled in our prior cases. See, e. g., *Haynes* v. *Washington,* 373 U. S. 503, 518–519 (1963); *Rogers* v. *Richmond,* 365 U. S. 534, 541 (1961); *Malinski* v. *New York,* 324 U. S. 401, 402 (1945).[52]

---

[51] Miranda, Vignera, and Westover were identified by eyewitnesses. Marked bills from the bank robbed were found in Westover's car. Articles stolen from the victim as well as from several other robbery victims were found in Stewart's home at the outset of the investigation.

[52] Dealing as we do here with constitutional standards in relation to statements made, the existence of independent corroborating evidence produced at trial is, of course, irrelevant to our decisions. *Haynes* v. *Washington,* 373 U. S. 503, 518–519 (1963); *Lynumn* v.

It is also urged that an unfettered right to detention for interrogation should be allowed because it will often redound to the benefit of the person questioned. When police inquiry determines that there is no reason to believe that the person has committed any crime, it is said, he will be released without need for further formal procedures. The person who has committed no offense, however, will be better able to clear himself after warnings with counsel present than without. It can be assumed that in such circumstances a lawyer would advise his client to talk freely to police in order to clear himself.

Custodial interrogation, by contrast, does not necessarily afford the innocent an opportunity to clear themselves. A serious consequence of the present practice of the interrogation alleged to be beneficial for the innocent is that many arrests "for investigation" subject large numbers of innocent persons to detention and interrogation. In one of the cases before us, No. 584, *California* v. *Stewart*, police held four persons, who were in the defendant's house at the time of the arrest, in jail for five days until defendant confessed. At that time they were finally released. Police stated that there was "no evidence to connect them with any crime." Available statistics on the extent of this practice where it is condoned indicate that these four are far from alone in being subjected to arrest, prolonged detention, and interrogation without the requisite probable cause.[53]

---

*Illinois,* 372 U. S. 528, 537–538 (1963); *Rogers* v. *Richmond,* 365 U. S. 534, 541 (1961); *Blackburn* v. *Alabama,* 361 U. S. 199, 206 (1960).

[53] See, *e. g.,* Report and Recommendations of the [District of Columbia] Commissioners' Committee on Police Arrests for Investigation (1962); American Civil Liberties Union, Secret Detention by the Chicago Police (1959). An extreme example of this practice occurred in the District of Columbia in 1958. Seeking three "stocky" young Negroes who had robbed a restaurant, police rounded up 90 persons of that general description. Sixty-three were held overnight

Over the years the Federal Bureau of Investigation has compiled an exemplary record of effective law enforcement while advising any suspect or arrested person, at the outset of an interview, that he is not required to make a statement, that any statement may be used against him in court, that the individual may obtain the services of an attorney of his own choice and, more recently, that he has a right to free counsel if he is unable to pay.[54]   A letter received from the Solicitor General in response to a question from the Bench makes it clear that the present pattern of warnings and respect for the

before being released for lack of evidence.  A man not among the 90 arrested was ultimately charged with the crime.  Washington Daily News, January 21, 1958, p. 5, col. 1; Hearings before a Subcommittee of the Senate Judiciary Committee on H. R. 11477, S. 2970, S. 3325, and S. 3355, 85th Cong., 2d Sess. (July 1958), pp. 40, 78.

[54] In 1952, J. Edgar Hoover, Director of the Federal Bureau of Investigation, stated:

"Law enforcement, however, in defeating the criminal, must maintain inviolate the historic liberties of the individual.  To turn back the criminal, yet, by so doing, destroy the dignity of the individual, would be a hollow victory.

.     .     .     .     .

"We can have the Constitution, the best laws in the land, and the most honest reviews by courts—but unless the law enforcement profession is steeped in the democratic tradition, maintains the highest in ethics, and makes its work a career of honor, civil liberties will continually—and without end—be violated. . . .  The best protection of civil liberties is an alert, intelligent and honest law enforcement agency.  There can be no alternative.

.     .     .     .     .

". . . Special Agents are taught that any suspect or arrested person, at the outset of an interview, must be advised that he is not required to make a statement and that any statement given can be used against him in court.  Moreover, the individual must be informed that, if he desires, he may obtain the services of an attorney of his own choice."

Hoover, Civil Liberties and Law Enforcement: The Role of the FBI, 37 Iowa L. Rev. 175, 177–182 (1952).

rights of the individual followed as a practice by the FBI is consistent with the procedure which we delineate today. It states:

"At the oral argument of the above cause, Mr. Justice Fortas asked whether I could provide certain information as to the practices followed by the Federal Bureau of Investigation. I have directed these questions to the attention of the Director of the Federal Bureau of Investigation and am submitting herewith a statement of the questions and of the answers which we have received.

" '(1) When an individual is interviewed by agents of the Bureau, what warning is given to him?

" 'The standard warning long given by Special Agents of the FBI to both suspects and persons under arrest is that the person has a right to say nothing and a right to counsel, and that any statement he does make may be used against him in court. Examples of this warning are to be found in the *Westover* case at 342 F. 2d 684 (1965), and *Jackson* v. *U. S.,* 337 F. 2d 136 (1964), cert. den. 380 U. S. 935.

" 'After passage of the Criminal Justice Act of 1964, which provides free counsel for Federal defendants unable to pay, we added to our instructions to Special Agents the requirement that any person who is under arrest for an offense under FBI jurisdiction, or whose arrest is contemplated following the interview, must also be advised of his right to free counsel if he is unable to pay, and the fact that such counsel will be assigned by the Judge. At the same time, we broadened the right to counsel warn-

ing to read counsel of his own choice, or anyone else with whom he might wish to speak.

" '(2) When is the warning given?

" 'The FBI warning is given to a suspect at the very outset of the interview, as shown in the *Westover* case, cited above. The warning may be given to a person arrested as soon as practicable after the arrest, as shown in the *Jackson* case, also cited above, and in *U. S.* v. *Konigsberg,* 336 F. 2d 844 (1964), cert. den. 379 U. S. 933, but in any event it must precede the interview with the person for a confession or admission of his own guilt.

" '(3) What is the Bureau's practice in the event that (a) the individual requests counsel and (b) counsel appears?

" 'When the person who has been warned of his right to counsel decides that he wishes to consult with counsel before making a statement, the interview is terminated at that point, *Shultz* v. *U. S.,* 351 F. 2d 287 (1965). It may be continued, however, as to all matters *other* than the person's own guilt or innocence. If he is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing Agent. For example, in *Hiram* v. *U. S.,* 354 F. 2d 4 (1965), the Agent's conclusion that the person arrested had waived his right to counsel was upheld by the courts.

" 'A person being interviewed and desiring to consult counsel by telephone must be permitted to do so, as shown in *Caldwell* v. *U. S.,* 351 F. 2d 459 (1965). When counsel appears in person, he is permitted to confer with his client in private.

" '(4) What is the Bureau's practice if the individual requests counsel, but cannot afford to retain an attorney?

. " 'If any person being interviewed after warning of counsel decides that he wishes to consult with counsel before proceeding further the interview is terminated, as shown above. FBI Agents do not pass judgment on the ability of the person to pay for counsel. They do, however, advise those who have been arrested for an offense under FBI jurisdiction, or whose arrest is contemplated following the interview, of a right to free counsel *if* they are unable to pay, and the availability of such counsel from the Judge.' " [55]

The practice of the FBI can readily be emulated by state and local enforcement agencies. The argument that the FBI deals with different crimes than are dealt with by state authorities does not mitigate the significance of the FBI experience.[56]

The experience in some other countries also suggests that the danger to law enforcement in curbs on interrogation is overplayed. The English procedure since 1912 under the Judges' Rules is significant. As recently

---

[55] We agree that the interviewing agent must exercise his judgment in determining whether the individual waives his right to counsel. Because of the constitutional basis of the right, however, the standard for waiver is necessarily high. And, of course, the ultimate responsibility for resolving this constitutional question lies with the courts.

[56] Among the crimes within the enforcement jurisdiction of the FBI are kidnapping, 18 U. S. C. § 1201 (1964 ed.), white slavery, 18 U. S. C. §§ 2421–2423 (1964 ed.), bank robbery, 18 U. S. C. § 2113 (1964 ed.), interstate transportation and sale of stolen property, 18 U. S. C. §§ 2311–2317 (1964 ed.), all manner of conspiracies, 18 U. S. C. § 371 (1964 ed.), and violations of civil rights, 18 U. S. C. §§ 241–242 (1964 ed.). See also 18 U. S. C. § 1114 (1964 ed.) (murder of officer or employee of the United States).

strengthened, the Rules require that a cautionary warning be given an accused by a police officer as soon as he has evidence that affords reasonable grounds for suspicion; they also require that any statement made be given by the accused without questioning by police.[57]

---

[57] [1964] Crim. L. Rev., at 166–170. These Rules provide in part:

"II. As soon as a police officer has evidence which would afford reasonable grounds for suspecting that a person has committed an offence, he shall caution that person or cause him to be cautioned before putting to him any questions, or further questions, relating to that offence.

"The caution shall be in the following terms:

" 'You are not obliged to say anything unless you wish to do so but what you say may be put into writing and given in evidence.'

"When after being cautioned a person is being questioned, or elects to make a statement, a record shall be kept of the time and place at which any such questioning or statement began and ended and of the persons present.

. . . . .

"III. . . .

. . . . .

"(b) It is only in exceptional cases that questions relating to the offence should be put to the accused person after he has been charged or informed that he may be prosecuted.

. . . . .

"IV. All written statements made after caution shall be taken in the following manner:

"(a) If a person says that he wants to make a statement he shall be told that it is intended to make a written record of what he says.

"He shall always be asked whether he wishes to write down himself what he wants to say; if he says that he cannot write or that he would like someone to write it for him, a police officer may offer to write the statement for him. . . .

"(b) Any person writing his own statement shall be allowed to do so without any prompting as distinct from indicating to him what matters are material.

. . . . .

"(d) Whenever a police officer writes the statement, he shall take down the exact words spoken by the person making the statement, without putting any questions other than such as may be needed to

The right of the individual to consult with an attorney during this period is expressly recognized.[58]

The safeguards present under Scottish law may be even greater than in England. Scottish judicial decisions bar use in evidence of most confessions obtained through police interrogation.[59] In India, confessions made to police not in the presence of a magistrate have been ex-

---

make the statement coherent, intelligible and relevant to the material matters: he shall not prompt him."

The prior Rules appear in Devlin, The Criminal Prosecution in England 137–141 (1958).

Despite suggestions of some laxity in enforcement of the Rules and despite the fact some discretion as to admissibility is invested in the trial judge, the Rules are a significant influence in the English criminal law enforcement system. See, e. g., [1964] Crim. L. Rev., at 182; and articles collected in [1960] Crim. L. Rev., at 298–356.

[58] The introduction to the Judges' Rules states in part:

"These Rules do not affect the principles

.            .            .            .            .

"(c) That every person at any stage of an investigation should be able to communicate and to consult privately with a solicitor. This is so even if he is in custody provided that in such a case no unreasonable delay or hindrance is caused to the processes of investigation or the administration of justice by his doing so . . . ." [1964] Crim. L. Rev., at 166–167.

[59] As stated by the Lord Justice General in *Chalmers* v. *H. M. Advocate,* [1954] Sess. Cas. 66, 78 (J. C.):

"The theory of our law is that at the stage of initial investigation the police may question anyone with a view to acquiring information which may lead to the detection of the criminal; but that, when the stage has been reached at which suspicion, or more than suspicion, has in their view centred upon some person as the likely perpetrator of the crime, further interrogation of that person becomes very dangerous, and, if carried too far, e. g., to the point of extracting a confession by what amounts to cross-examination, the evidence of that confession will almost certainly be excluded. Once the accused has been apprehended and charged he has the statutory right to a private interview with a solicitor and to be brought before a magistrate with all convenient speed so that he may, if so advised, emit a declaration in presence of his solicitor under conditions which safeguard him against prejudice."

cluded by rule of evidence since 1872, at a time when it operated under British law.[60] Identical provisions appear in the Evidence Ordinance of Ceylon, enacted in 1895.[61] Similarly, in our country the Uniform Code of Military Justice has long provided that no suspect may be interrogated without first being warned of his right not to make a statement and that any statement he makes may be used against him.[62] Denial of the right to consult counsel during interrogation has also been proscribed by military tribunals.[63] There appears to have been no marked detrimental effect on criminal law enforcement in these jurisdictions as a result of these rules. Conditions of law enforcement in our country are sufficiently similar to permit reference to this experience as assurance that lawlessness will not result from warning an individual of his rights or allowing him to exercise them. Moreover, it is consistent with our legal system that we give at least as much protection to these rights as is given in the jurisdictions described. We deal in our country with rights grounded in a specific requirement of the Fifth Amendment of the Constitution,

---

[60] "No confession made to a police officer shall be proved as against a person accused of any offence." Indian Evidence Act § 25.

"No confession made by any person whilst he is in the custody of a police officer unless it be made in the immediate presence of a Magistrate, shall be proved as against such person." Indian Evidence Act § 26. See 1 Ramaswami & Rajagopalan, Law of Evidence in India 553–569 (1962). To avoid any continuing effect of police pressure or inducement, the Indian Supreme Court has invalidated a confession made shortly after police brought a suspect before a magistrate, suggesting: "[I]t would, we think, be reasonable to insist upon giving an accused person at least 24 hours to decide whether or not he should make a confession." *Sarwan Singh* v. *State of Punjab,* 44 All India Rep. 1957, Sup. Ct. 637, 644.

[61] I Legislative Enactments of Ceylon 211 (1958).

[62] 10 U. S. C. § 831 (b) (1964 ed.).

[63] *United States* v. *Rose,* 24 CMR 251 (1957); *United States* v. *Gunnels,* 23 CMR 354 (1957).

whereas other jurisdictions arrived at their conclusions on the basis of principles of justice not so specifically defined.[64]

It is also urged upon us that we withhold decision on this issue until state legislative bodies and advisory groups have had an opportunity to deal with these problems by rule making.[65] We have already pointed out that the Constitution does not require any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation. Congress and the States are free to develop their own safeguards for the privilege, so long as they are fully as effective as those described above in informing accused persons of their right of silence and in affording a continuous opportunity to exercise it. In any event, however, the issues presented are of constitutional dimensions and must be determined by the courts. The admissibility of a statement in the face of a claim that it was obtained in violation of the defendant's constitutional rights is an issue the resolution of which has long since been undertaken by this Court. See *Hopt* v. *Utah,* 110 U. S. 574 (1884). Judicial solutions to problems of constitutional dimension have evolved decade by decade. As courts have been presented with the need to enforce constitutional rights, they have found means of doing so. That was our responsibility when *Escobedo* was before us and it is our

---

[64] Although no constitution existed at the time confessions were excluded by rule of evidence in 1872, India now has a written constitution which includes the provision that "No person accused of any offence shall be compelled to be a witness against himself." Constitution of India, Article 20 (3). See Tope, The Constitution of India 63–67 (1960).

[65] Brief for United States in No. 761, *Westover* v. *United States,* pp. 44–47; Brief for the State of New York as *amicus curiae,* pp. 35–39. See also Brief for the National District Attorneys Association as *amicus curiae,* pp. 23–26.

responsibility today. Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them.

## V.

Because of the nature of the problem and because of its recurrent significance in numerous cases, we have to this point discussed the relationship of the Fifth Amendment privilege to police interrogation without specific concentration on the facts of the cases before us. We turn now to these facts to consider the application to these cases of the constitutional principles discussed above. In each instance, we have concluded that statements were obtained from the defendant under circumstances that did not meet constitutional standards for protection of the privilege.

No. 759. *Miranda v. Arizona.*

On March 13, 1963, petitioner, Ernesto Miranda, was arrested at his home and taken in custody to a Phoenix police station. He was there identified by the complaining witness. The police then took him to "Interrogation Room No. 2" of the detective bureau. There he was questioned by two police officers. The officers admitted at trial that Miranda was not advised that he had a right to have an attorney present.[66] Two hours later, the

---

[66] Miranda was also convicted in a separate trial on an unrelated robbery charge not presented here for review. A statement introduced at that trial was obtained from Miranda during the same interrogation which resulted in the confession involved here. At the robbery trial, one officer testified that during the interrogation he did not tell Miranda that anything he said would be held against. him or that he could consult with an attorney. The other officer stated that they had both told Miranda that anything he said would be used against him and that he was not required by law to tell them anything.

officers emerged from the interrogation room with a written confession signed by Miranda. At the top of the statement was a typed paragraph stating that the confession was made voluntarily, without threats or promises of immunity and "with full knowledge of my legal rights, understanding any statement I make may be used against me." [67]

At his trial before a jury, the written confession was admitted into evidence over the objection of defense counsel, and the officers testified to the prior oral confession made by Miranda during the interrogation. Miranda was found guilty of kidnapping and rape. He was sentenced to 20 to 30 years' imprisonment on each count, the sentences to run concurrently. On appeal, the Supreme Court of Arizona held that Miranda's constitutional rights were not violated in obtaining the confession and affirmed the conviction. 98 Ariz. 18, 401 P. 2d 721. In reaching its decision, the court emphasized heavily the fact that Miranda did not specifically request counsel.

We reverse. From the testimony of the officers and by the admission of respondent, it is clear that Miranda was not in any way apprised of his right to consult with an attorney and to have one present during the interrogation, nor was his right not to be compelled to incriminate himself effectively protected in any other manner. Without these warnings the statements were inadmissible. The mere fact that he signed a statement which contained a typed-in clause stating that he had "full knowledge" of his "legal rights" does not approach the knowing and intelligent waiver required to relinquish constitutional rights. Cf. *Haynes* v. *Washington*, 373 U. S.

---

[67] One of the officers testified that he read this paragraph to Miranda. Apparently, however, he did not do so until after Miranda had confessed orally.

503, 512–513 (1963); *Haley* v. *Ohio,* 332 U. S. 596, 601 (1948) (opinion of MR. JUSTICE DOUGLAS).

No. 760.   *Vignera* v. *New York.*

Petitioner, Michael Vignera, was picked up by New York police on October 14, 1960, in connection with the robbery three days earlier of a Brooklyn dress shop. They took him to the 17th Detective Squad headquarters in Manhattan.   Sometime thereafter he was taken to the 66th Detective Squad.   There a detective questioned Vignera with respect to the robbery.   Vignera orally admitted the robbery to the detective.   The detective was asked on cross-examination at trial by defense counsel whether Vignera was warned of his right to counsel before being interrogated.   The prosecution objected to the question and the trial judge sustained the objection. Thus, the defense was precluded from making any showing that warnings had not been given.   While at the 66th Detective Squad, Vignera was identified by the store owner and a saleslady as the man who robbed the dress shop.   At about 3 p. m. he was formally arrested. The police then transported him to still another station, the 70th Precinct in Brooklyn, "for detention."   At 11 p. m. Vignera was questioned by an assistant district attorney in the presence of a hearing reporter who transcribed the questions and Vignera's answers.   This verbatim account of these proceedings contains no statement of any warnings given by the assistant district attorney.   At Vignera's trial on a charge of first degree robbery, the detective testified as to the oral confession. The transcription of the statement taken was also introduced in evidence.   At the conclusion of the testimony, the trial judge charged the jury in part as follows:

> "The law doesn't say that the confession is void or invalidated because the police officer didn't advise the defendant as to his rights.   Did you hear what

I said? I am telling you what the law of the State of New York is."

Vignera was found guilty of first degree robbery. He was subsequently adjudged a third-felony offender and sentenced to 30 to 60 years' imprisonment.[68] The conviction was affirmed without opinion by the Appellate Division, Second Department, 21 App. Div. 2d 752, 252 N. Y. S. 2d 19, and by the Court of Appeals, also without opinion, 15 N. Y. 2d 970, 207 N. E. 2d 527, 259 N. Y. S. 2d 857, remittitur amended, 16 N. Y. 2d 614, 209 N. E. 2d 110, 261 N. Y. S. 2d 65. In argument to the Court of Appeals, the State contended that Vignera had no constitutional right to be advised of his right to counsel or his privilege against self-incrimination.

We reverse. The foregoing indicates that Vignera was not warned of any of his rights before the questioning by the detective and by the assistant district attorney. No other steps were taken to protect these rights. Thus he was not effectively apprised of his Fifth Amendment privilege or of his right to have counsel present and his statements are inadmissible.

No. 761. *Westover* v. *United States.*

At approximately 9:45 p. m. on March 20, 1963, petitioner, Carl Calvin Westover, was arrested by local police in Kansas City as a suspect in two Kansas City robberies. A report was also received from the FBI that he was wanted on a felony charge in California. The local authorities took him to a police station and placed him in a line-up on the local charges, and at about 11:45 p. m. he was booked. Kansas City police interrogated West-

---

[68] Vignera thereafter successfully attacked the validity of one of the prior convictions, *Vignera* v. *Wilkins*, Civ. 9901 (D. C. W. D. N. Y. Dec. 31, 1961) (unreported), but was then resentenced as a second-felony offender to the same term of imprisonment as the original sentence. R. 31–33.

over on the night of his arrest. He denied any knowledge of criminal activities. The next day local officers interrogated him again throughout the morning. Shortly before noon they informed the FBI that they were through interrogating Westover and that the FBI could proceed to interrogate him. There is nothing in the record to indicate that Westover was ever given any warning as to his rights by local police. At noon, three special agents of the FBI continued the interrogation in a private interview room of the Kansas City Police Department, this time with respect to the robbery of a savings and loan association and a bank in Sacramento, California. After two or two and one-half hours, Westover signed separate confessions to each of these two robberies which had been prepared by one of the agents during the interrogation. At trial one of the agents testified, and a paragraph on each of the statements states, that the agents advised Westover that he did not have to make a statement, that any statement he made could be used against him, and that he had the right to see an attorney.

Westover was tried by a jury in federal court and convicted of the California robberies. His statements were introduced at trial. He was sentenced to 15 years' imprisonment on each count, the sentences to run consecutively. On appeal, the conviction was affirmed by the Court of Appeals for the Ninth Circuit. 342 F. 2d 684.

We reverse. On the facts of this case we cannot find that Westover knowingly and intelligently waived his right to remain silent and his right to consult with counsel prior to the time he made the statement.[69] At the

---

[69] The failure of defense counsel to object to the introduction of the confession at trial, noted by the Court of Appeals and emphasized by the Solicitor General, does not preclude our consideration of the issue. Since the trial was held prior to our decision in *Escobedo* and, of course, prior to our decision today making the

time the FBI agents began questioning Westover, he had been in custody for over 14 hours and had been interrogated at length during that period. The FBI interrogation began immediately upon the conclusion of the interrogation by Kansas City police and was conducted in local police headquarters. Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were different, the impact on him was that of a continuous period of questioning. There is no evidence of any warning given prior to the FBI interrogation nor is there any evidence of an articulated waiver of rights after the FBI commenced its interrogation. The record simply shows that the defendant did in fact confess a short time after being turned over to the FBI following interrogation by local police. Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights cannot be assumed.

We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from West-

objection available, the failure to object at trial does not constitute a waiver of the claim. See, e. g., *United States ex rel. Angelet* v. *Fay,* 333 F. 2d 12, 16 (C. A. 2d Cir. 1964), aff'd, 381 U. S. 654 (1965). Cf. *Ziffrin, Inc.* v. *United States,* 318 U. S. 73, 78 (1943).

over the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege.

No. 584.  *California v. Stewart.*

In the course of investigating a series of purse-snatch robberies in which one of the victims had died of injuries inflicted by her assailant, respondent, Roy Allen Stewart, was pointed out to Los Angeles police as the endorser of dividend checks taken in one of the robberies.  At about 7:15 p. m., January 31, 1963, police officers went to Stewart's house and arrested him.  One of the officers asked Stewart if they could search the house, to which he replied, "Go ahead."  The search turned up various items taken from the five robbery victims.  At the time of Stewart's arrest, police also arrested Stewart's wife and three other persons who were visiting him.  These four were jailed along with Stewart and were interrogated.  Stewart was taken to the University Station of the Los Angeles Police Department where he was placed in a cell.  During the next five days, police interrogated Stewart on nine different occasions.  Except during the first interrogation session, when he was confronted with an accusing witness, Stewart was isolated with his interrogators.

During the ninth interrogation session, Stewart admitted that he had robbed the deceased and stated that he had not meant to hurt her.  Police then brought Stewart before a magistrate for the first time.  Since there was no evidence to connect them with any crime, the police then released the other four persons arrested with him.

Nothing in the record specifically indicates whether Stewart was or was not advised of his right to remain silent or his right to counsel.  In a number of instances,

however, the interrogating officers were asked to recount everything that was said during the interrogations. None indicated that Stewart was ever advised of his rights.

Stewart was charged with kidnapping to commit robbery, rape, and murder. At his trial, transcripts of the first interrogation and the confession at the last interrogation were introduced in evidence. The jury found Stewart guilty of robbery and first degree murder and fixed the penalty as death. On appeal, the Supreme Court of California reversed. 62 Cal. 2d 571, 400 P. 2d 97, 43 Cal. Rptr. 201. It held that under this Court's decision in *Escobedo*, Stewart should have been advised of his right to remain silent and of his right to counsel and that it would not presume in the face of a silent record that the police advised Stewart of his rights.[70]

We affirm.[71] In dealing with custodial interrogation, we will not presume that a defendant has been effectively apprised of his rights and that his privilege against self-incrimination has been adequately safeguarded on a record that does not show that any warnings have been given or that any effective alternative has been employed. Nor can a knowing and intelligent waiver of

---

[70] Because of this disposition of the case, the California Supreme Court did not reach the claims that the confession was coerced by police threats to hold his ailing wife in custody until he confessed, that there was no hearing as required by *Jackson* v. *Denno*, 378 U. S. 368 (1964), and that the trial judge gave an instruction condemned by the California Supreme Court's decision in *People* v. *Morse*, 60 Cal. 2d 631, 388 P. 2d 33, 36 Cal. Rptr. 201 (1964).

[71] After certiorari was granted in this case, respondent moved to dismiss on the ground that there was no final judgment from which the State could appeal since the judgment below directed that he be retried. In the event respondent was successful in obtaining an acquittal on retrial, however, under California law the State would have no appeal. Satisfied that in these circumstances the decision below constituted a final judgment under 28 U. S. C. § 1257 (3) (1964 ed.), we denied the motion. 383 U. S. 903.

these rights be assumed on a silent record. Furthermore, Stewart's steadfast denial of the alleged offenses through eight of the nine interrogations over a period of five days is subject to no other construction than that he was compelled by persistent interrogation to forgo his Fifth Amendment privilege.

Therefore, in accordance with the foregoing, the judgments of the Supreme Court of Arizona in No. 759, of the New York Court of Appeals in No. 760, and of the Court of Appeals for the Ninth Circuit in No. 761 are reversed. The judgment of the Supreme Court of California in No. 584 is affirmed.

*It is so ordered.*

MR. JUSTICE CLARK, dissenting in Nos. 759, 760, and 761, and concurring in the result in No. 584.

It is with regret that I find it necessary to write in these cases. However, I am unable to join the majority because its opinion goes too far on too little, while my dissenting brethren do not go quite far enough. Nor can I join in the Court's criticism of the present practices of police and investigatory agencies as to custodial interrogation. The materials it refers to as "police manuals" [1] are, as I read them, merely writings in this field by professors and some police officers. Not one is shown by the record here to be the official manual of any police department, much less in universal use in crime detection. Moreover, the examples of police brutality mentioned by the Court [2] are rare exceptions to the thousands of cases

---

[1] *E. g.,* Inbau & Reid, Criminal Interrogation and Confessions (1962); O'Hara, Fundamentals of Criminal Investigation (1956); Dienstein, Technics for the Crime Investigator (1952); Mulbar, Interrogation (1951); Kidd, Police Interrogation (1940).

[2] As developed by my Brother HARLAN, *post,* pp. 506–514, such cases, with the exception of the long-discredited decision in *Bram* v. *United States,* 168 U. S. 532 (1897), were adequately treated in terms of due process.

that appear every year in the law reports. The police agencies—all the way from municipal and state forces to the federal bureaus—are responsible for law enforcement and public safety in this country. I am proud of their efforts, which in my view are not fairly characterized by the Court's opinion.

## I.

The *ipse dixit* of the majority has no support in our cases. Indeed, the Court admits that "we might not find the defendants' statements [here] to have been involuntary in traditional terms." *Ante,* p. 457. In short, the Court has added more to the requirements that the accused is entitled to consult with his lawyer and that he must be given the traditional warning that he may remain silent and that anything that he says may be used against him. *Escobedo* v. *Illinois,* 378 U. S. 478, 490–491 (1964). Now, the Court fashions a constitutional rule that the police may engage in no custodial interrogation without additionally advising the accused that he has a right under the Fifth Amendment to the presence of counsel during interrogation and that, if he is without funds, counsel will be furnished him. When at any point during an interrogation the accused seeks affirmatively or impliedly to invoke his rights to silence or counsel, interrogation must be forgone or postponed. The Court further holds that failure to follow the new procedures requires inexorably the exclusion of any statement by the accused, as well as the fruits thereof. Such a strict constitutional specific inserted at the nerve center of crime detection may well kill the patient.[3]

---

[3] The Court points to England, Scotland, Ceylon and India as having equally rigid rules. As my Brother HARLAN points out, *post,* pp. 521–523, the Court is mistaken in this regard, for it overlooks counterbalancing prosecutorial advantages. Moreover, the requirements of the Federal Bureau of Investigation do not appear from the Solicitor General's letter, *ante,* pp. 484–486, to be as strict as

Since there is at this time a paucity of information and an almost total lack of empirical knowledge on the practical operation of requirements truly comparable to those announced by the majority, I would be more restrained lest we go too far too fast.

## II.

Custodial interrogation has long been recognized as "undoubtedly an essential tool in effective law enforcement." *Haynes* v. *Washington,* 373 U. S. 503, 515 (1963). Recognition of this fact should put us on guard against the promulgation of doctrinaire rules. Especially is this true where the Court finds that "the Constitution has prescribed" its holding and where the light of our past cases, from *Hopt* v. *Utah,* 110 U. S. 574, (1884), down to *Haynes* v. *Washington, supra,* is to

those imposed today in at least two respects: (1) The offer of counsel is articulated only as "a right to counsel"; nothing is said about a right to have counsel present at the custodial interrogation. (See also the examples cited by the Solicitor General, *Westover* v. *United States,* 342 F. 2d 684, 685 (1965) ("right to consult counsel"); *Jackson* v. *United States,* 337 F. 2d 136, 138 (1964) (accused "entitled to an attorney").) Indeed, the practice is that whenever the suspect "decides that he wishes to consult with counsel before making a statement, the interview is terminated at that point . . . . When counsel appears in person, he is permitted to confer with his client in private." This clearly indicates that the FBI does not warn that counsel may be present during custodial interrogation. (2) The Solicitor General's letter states: "[T]hose who have been arrested for an offense under FBI jurisdiction, or whose arrest is contemplated following the interview, [are advised] of a right to free counsel *if* they are unable to pay, and the availability of such counsel from the Judge." So phrased, this warning does not indicate that the agent will secure counsel. Rather, the statement may well be interpreted by the suspect to mean that the burden is placed upon himself and that he may have counsel appointed only when brought before the judge or at trial—but not at custodial interrogation. As I view the FBI practice, it is not as broad as the one laid down today by the Court.

the contrary. Indeed, even in *Escobedo* the Court never hinted that an affirmative "waiver" was a prerequisite to questioning; that the burden of proof as to waiver was on the prosecution; that the presence of counsel—absent a waiver—during interrogation was required; that a waiver can be withdrawn at the will of the accused; that counsel must be furnished during an accusatory stage to those unable to pay; nor that admissions and exculpatory statements are "confessions." To require all those things at one gulp should cause the Court to choke over more cases than *Crooker* v. *California,* 357 U. S. 433 (1958), and *Cicenia* v. *Lagay,* 357 U. S. 504 (1958), which it expressly overrules today.

The rule prior to today—as Mr. Justice Goldberg, the author of the Court's opinion in *Escobedo,* stated it in *Haynes* v. *Washington*—depended upon "a totality of circumstances evidencing an involuntary . . . admission of guilt." 373 U. S., at 514. And he concluded:

> "Of course, detection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement. The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused. . . . We are here impelled to the conclusion, from all of the facts presented, that the bounds of due process have been exceeded." *Id.,* at 514–515.

## III.

I would continue to follow that rule. Under the "totality of circumstances" rule of which my Brother Goldberg spoke in *Haynes,* I would consider in each case whether the police officer prior to custodial interrogation added the warning that the suspect might have counsel present at the interrogation and, further, that a court would appoint one at his request if he was too poor to employ counsel. In the absence of warnings, the burden would be on the State to prove that counsel was knowingly and intelligently waived or that in the totality of the circumstances, including the failure to give the necessary warnings, the confession was clearly voluntary.

Rather than employing the arbitrary Fifth Amendment rule [4] which the Court lays down I would follow the more pliable dictates of the Due Process Clauses of the Fifth and Fourteenth Amendments which we are accustomed to administering and which we know from our cases are effective instruments in protecting persons in police custody. In this way we would not be acting in the dark nor in one full sweep changing the traditional rules of custodial interrogation which this Court has for so long recognized as a justifiable and proper tool in balancing individual rights against the rights of society. It will be soon enough to go further when we are able to appraise with somewhat better accuracy the effect of such a holding.

I would affirm the convictions in *Miranda* v. *Arizona,* No. 759; *Vignera* v. *New York,* No. 760; and *Westover* v. *United States,* No. 761. In each of those cases I find from the circumstances no warrant for reversal. In

---

[4] In my view there is "no significant support" in our cases for the holding of the Court today that the Fifth Amendment privilege, in effect, forbids custodial interrogation. For a discussion of this point see the dissenting opinion of my Brother WHITE, post, pp. 526–531.

*California* v. *Stewart,* No. 584, I would dismiss the writ of certiorari for want of a final judgment, 28 U. S. C. § 1257 (3) (1964 ed.); but if the merits are to be reached I would affirm on the ground that the State failed to fulfill its burden, in the absence of a showing that appropriate warnings were given, of proving a waiver or a totality of circumstances showing voluntariness. Should there be a retrial, I would leave the State free to attempt to prove these elements.

Mr. Justice Harlan, whom Mr. Justice Stewart and Mr. Justice White join, dissenting.

I believe the decision of the Court represents poor constitutional law and entails harmful consequences for the country at large. How serious these consequences may prove to be only time can tell. But the basic flaws in the Court's justification seem to me readily apparent now once all sides of the problem are considered.

## I. Introduction.

At the outset, it is well to note exactly what is required by the Court's new constitutional code of rules for confessions. The foremost requirement, upon which later admissibility of a confession depends, is that a four-fold warning be given to a person in custody before he is questioned, namely, that he has a right to remain silent, that anything he says may be used against him, that he has a right to have present an attorney during the questioning, and that if indigent he has a right to a lawyer without charge. To forgo these rights, some affirmative statement of rejection is seemingly required, and threats, tricks, or cajolings to obtain this waiver are forbidden. If before or during questioning the suspect seeks to invoke his right to remain silent, interrogation must be forgone or cease; a request for counsel

brings about the same result until a lawyer is procured. Finally, there are a miscellany of minor directives, for example, the burden of proof of waiver is on the State, admissions and exculpatory statements are treated just like confessions, withdrawal of a waiver is always permitted, and so forth.[1]

While the fine points of this scheme are far less clear than the Court admits, the tenor is quite apparent. The new rules are not designed to guard against police brutality or other unmistakably banned forms of coercion. Those who use third-degree tactics and deny them in court are equally able and destined to lie as skillfully about warnings and waivers. Rather, the thrust of the new rules is to negate all pressures, to reinforce the nervous or ignorant suspect, and ultimately to discourage any confession at all. The aim in short is toward "voluntariness" in a utopian sense, or to view it from a different angle, voluntariness with a vengeance.

To incorporate this notion into the Constitution requires a strained reading of history and precedent and a disregard of the very pragmatic concerns that alone may on occasion justify such strains. I believe that reasoned examination will show that the Due Process Clauses provide an adequate tool for coping with confessions and that, even if the Fifth Amendment privilege against self-incrimination be invoked, its precedents taken as a whole do not sustain the present rules. Viewed as a choice based on pure policy, these new rules prove to be a highly debatable, if not one-sided, appraisal of the competing interests, imposed over widespread objection, at the very time when judicial restraint is most called for by the circumstances.

---

[1] My discussion in this opinion is directed to the main questions decided by the Court and necessary to its decision; in ignoring some of the collateral points, I do not mean to imply agreement.

## II. Constitutional Premises.

It is most fitting to begin an inquiry into the constitutional precedents by surveying the limits on confessions the Court has evolved under the Due Process Clause of the Fourteenth Amendment. This is so because these cases show that there exists a workable and effective means of dealing with confessions in a judicial manner; because the cases are the baseline from which the Court now departs and so serve to measure the actual as opposed to the professed distance it travels; and because examination of them helps reveal how the Court has coasted into its present position.

The earliest confession cases in this Court emerged from federal prosecutions and were settled on a nonconstitutional basis, the Court adopting the common-law rule that the absence of inducements, promises, and threats made a confession voluntary and admissible. *Hopt* v. *Utah*, 110 U. S. 574; *Pierce* v. *United States*, 160 U. S. 355. While a later case said the Fifth Amendment privilege controlled admissibility, this proposition was not itself developed in subsequent decisions.[2] The Court did, however, heighten the test of admissibility in federal trials to one of voluntariness "in fact," *Wan* v.

---

[2] The case was *Bram* v. *United States*, 168 U. S. 532 (quoted, *ante*, p. 461). Its historical premises were afterwards disproved by Wigmore, who concluded "that no assertions could be more unfounded." 3 Wigmore, Evidence § 823, at 250, n. 5 (3d ed. 1940). The Court in *United States* v. *Carignan*, 342 U. S. 36, 41, declined to choose between *Bram* and Wigmore, and *Stein* v. *New York*, 346 U. S. 156, 191, n. 35, cast further doubt on *Bram*. There are, however, several Court opinions which assume in dicta the relevance of the Fifth Amendment privilege to confessions. *Burdeau* v. *McDowell*, 256 U. S. 465, 475; see *Shotwell Mfg. Co.* v. *United States*, 371 U. S. 341, 347. On *Bram* and the federal confession cases generally, see Developments in the Law—Confessions, 79 Harv. L. Rev. 935, 959–961 (1966).

*United States,* 266 U. S. 1, 14 (quoted, *ante,* p. 462), and then by and large left federal judges to apply the same standards the Court began to derive in a string of state court cases.

This new line of decisions, testing admissibility by the Due Process Clause, began in 1936 with *Brown* v. *Mississippi,* 297 U. S. 278, and must now embrace somewhat more than 30 full opinions of the Court.[3] While the voluntariness rubric was repeated in many instances, *e. g., Lyons* v. *Oklahoma,* 322 U. S. 596, the Court never pinned it down to a single meaning but on the contrary infused it with a number of different values. To travel quickly over the main themes, there was an initial emphasis on reliability, *e. g., Ward* v. *Texas,* 316 U. S. 547, supplemented by concern over the legality and fairness of the police practices, *e. g., Ashcraft* v. *Tennessee,* 322 U. S. 143, in an "accusatorial" system of law enforcement, *Watts* v. *Indiana,* 338 U. S. 49, 54, and eventually by close attention to the individual's state of mind and capacity for effective choice, *e. g., Gallegos* v. *Colorado,* 370 U. S. 49. The outcome was a continuing re-evaluation on the facts of each case of *how much* pressure on the suspect was permissible.[4]

---

[3] Comment, 31 U. Chi. L. Rev. 313 & n. 1 (1964), states that by the 1963 Term 33 state coerced-confession cases had been decided by this Court, apart from *per curiams. Spano* v. *New York,* 360 U. S. 315, 321, n. 2, collects 28 cases.

[4] Bator & Vorenberg, Arrest, Detention, Interrogation and the Right to Counsel, 66 Col. L. Rev. 62, 73 (1966): "In fact, the concept of involuntariness seems to be used by the courts as a shorthand to refer to practices which are repellent to civilized standards of decency or which, under the circumstances, are thought to apply a degree of pressure to an individual which unfairly impairs his capacity to make a rational choice." See Herman, The Supreme Court and Restrictions on Police Interrogation, 25 Ohio St. L. J. 449, 452–458 (1964); Developments, *supra,* n. 2, at 964–984.

Among the criteria often taken into account were threats or imminent danger, *e. g., Payne* v. *Arkansas,* 356 U. S. 560, physical deprivations such as lack of sleep or food, *e. g., Reck* v. *Pate,* 367 U. S. 433, repeated or extended interrogation, *e. g., Chambers* v. *Florida,* 309 U. S. 227, limits on access to counsel or friends, *Crooker* v. *California,* 357 U. S. 433; *Cicenia* v. *Lagay,* 357 U. S. 504, length and illegality of detention under state law, *e. g.,* *Haynes* v. *Washington,* 373 U. S. 503, and individual weakness or incapacities, *Lynumn* v. *Illinois,* 372 U. S. 528. Apart from direct physical coercion, however, no single default or fixed combination of defaults guaranteed exclusion, and synopses of the cases would serve little use because the overall gauge has been steadily changing, usually in the direction of restricting admissibility. But to mark just what point had been reached before the Court jumped the rails in *Escobedo* v. *Illinois,* 378 U. S. 478, it is worth capsulizing the then-recent case of *Haynes* v. *Washington,* 373 U. S. 503. There, Haynes had been held some 16 or more hours in violation of state law before signing the disputed confession, had received no warnings of any kind, and despite requests had been refused access to his wife or to counsel, the police indicating that access would be allowed after a confession. Emphasizing especially this last inducement and rejecting some contrary indicia of voluntariness, the Court in a 5-to-4 decision held the confession inadmissible.

There are several relevant lessons to be drawn from this constitutional history. The first is that with over 25 years of precedent the Court has developed an elaborate, sophisticated, and sensitive approach to admissibility of confessions. It is "judicial" in its treatment of one case at a time, see *Culombe* v. *Connecticut,* 367 U. S. 568, 635 (concurring opinion of THE CHIEF JUSTICE), flexible in its ability to respond to the endless mutations of fact presented, and ever more familiar to the lower courts.

Of course, strict certainty is not obtained in this developing process, but this is often so with constitutional principles, and disagreement is usually confined to that borderland of close cases where it matters least.

The second point is that in practice and from time to time in principle, the Court has given ample recognition to society's interest in suspect questioning as an instrument of law enforcement. Cases countenancing quite significant pressures can be cited without difficulty,[5] and the lower courts may often have been yet more tolerant. Of course the limitations imposed today were rejected by necessary implication in case after case, the right to warnings having been explicitly rebuffed in this Court many years ago. *Powers* v. *United States,* 223 U. S. 303; *Wilson* v. *United States,* 162 U. S. 613. As recently as *Haynes* v. *Washington,* 373 U. S. 503, 515, the Court openly acknowledged that questioning of witnesses and suspects "is undoubtedly an essential tool in effective law enforcement." Accord, *Crooker* v. *California,* 357 U. S. 433, 441.

Finally, the cases disclose that the language in many of the opinions overstates the actual course of decision. It has been said, for example, that an admissible confession must be made by the suspect "in the unfettered exercise of his own will," *Malloy* v. *Hogan,* 378 U. S. 1, 8, and that "a prisoner is not 'to be made the deluded instrument of his own conviction,'" *Culombe* v. *Connecticut,* 367 U. S. 568, 581 (Frankfurter, J., announcing the Court's judgment and an opinion). Though often repeated, such principles are rarely observed in full measure. Even the word "voluntary" may be deemed some-

---

[5] See the cases synopsized in Herman, *supra,* n. 4, at 456, nn. 36–39. One not too distant example is *Stroble* v. *California,* 343 U. S. 181, in which the suspect was kicked and threatened after his arrest, questioned a little later for two hours, and isolated from a lawyer trying to see him; the resulting confession was held admissible.

what misleading, especially when one considers many of the confessions that have been brought under its umbrella. See, *e. g., supra,* n. 5. The tendency to overstate may be laid in part to the flagrant facts often before the Court; but in any event one must recognize how it has tempered attitudes and lent some color of authority to the approach now taken by the Court.

I turn now to the Court's asserted reliance on the Fifth Amendment, an approach which I frankly regard as a *trompe l'oeil.* The Court's opinion in my view reveals no adequate basis for extending the Fifth Amendment's privilege against self-incrimination to the police station. Far more important, it fails to show that the Court's new rules are well supported, let alone compelled, by Fifth Amendment precedents. Instead, the new rules actually derive from quotation and analogy drawn from precedents under the Sixth Amendment, which should properly have no bearing on police interrogation.

The Court's opening contention, that the Fifth Amendment governs police station confessions, is perhaps not an impermissible extension of the law but it has little to commend itself in the present circumstances. Historically, the privilege against self-incrimination did not bear at all on the use of extra-legal confessions, for which distinct standards evolved; indeed, "the *history* of the two principles is wide apart, differing by one hundred years in origin, and derived through separate lines of precedents . . . ." 8 Wigmore, Evidence § 2266, at 401 (McNaughton rev. 1961). Practice under the two doctrines has also differed in a number of important respects.[6]

---

[6] Among the examples given in 8 Wigmore, Evidence § 2266, at 401 (McNaughton rev. 1961), are these: the privilege applies to any witness, civil or criminal, but the confession rule protects only criminal defendants; the privilege deals only with compulsion, while the confession rule may exclude statements obtained by trick or promise; and where the privilege has been nullified—as by the English Bankruptcy Act—the confession rule may still operate.

Even those who would readily enlarge the privilege must concede some linguistic difficulties since the Fifth Amendment in terms proscribes only compelling any person "in any criminal case to be a witness against himself." Cf. Kamisar, Equal Justice in the Gatehouses and Mansions of American Criminal Procedure, in Criminal Justice in Our Time 1, 25–26 (1965).

Though weighty, I do not say these points and similar ones are conclusive, for, as the Court reiterates, the privilege embodies basic principles always capable of expansion.[7]   Certainly the privilege does represent a protective concern for the accused and an emphasis upon accusatorial rather than inquisitorial values in law enforcement, although this is similarly true of other limitations such as the grand jury requirement and the reasonable doubt standard.   Accusatorial values, however, have openly been absorbed into the due process standard governing confessions; this indeed is why at present "the kinship of the two rules [governing confessions and self-incrimination] is too apparent for denial." McCormick, Evidence 155 (1954).   Since extension of the general principle has already occurred, to insist that the privilege applies as such serves only to carry over inapposite historical details and engaging rhetoric and to obscure the policy choices to be made in regulating confessions.

Having decided that the Fifth Amendment privilege does apply in the police station, the Court reveals that the privilege imposes more exacting restrictions than does the Fourteenth Amendment's voluntariness test.[8]

---

[7] Additionally, there are precedents and even historical arguments that can be arrayed in favor of bringing extra-legal questioning within the privilege. See generally Maguire, Evidence of Guilt § 2.03, at 15–16 (1959).

[8] This, of course, is implicit in the Court's introductory announcement that "[o]ur decision in *Malloy* v. *Hogan,* 378 U. S. 1 (1964) [extending the Fifth Amendment privilege to the States] necessitates

It then emerges from a discussion of *Escobedo* that the Fifth Amendment requires for an admissible confession that it be given by one distinctly aware of his right not to speak and shielded from "the compelling atmosphere" of interrogation. See *ante,* pp. 465–466. From these key premises, the Court finally develops the safeguards of warning, counsel, and so forth. I do not believe these premises are sustained by precedents under the Fifth Amendment.[9]

The more important premise is that pressure on the suspect must be eliminated though it be only the subtle influence of the atmosphere and surroundings. The Fifth Amendment, however, has never been thought to forbid *all* pressure to incriminate one's self in the situations covered by it. On the contrary, it has been held that failure to incriminate one's self can result in denial of removal of one's case from state to federal court, *Maryland* v. *Soper,* 270 U. S. 9; in refusal of a military commission, *Orloff* v. *Willoughby,* 345 U. S. 83; in denial of a discharge in bankruptcy, *Kaufman* v. *Hurwitz,* 176 F. 2d 210; and in numerous other adverse consequences. See 8 Wigmore, Evidence § 2272, at 441–444, n. 18 (McNaughton rev. 1961); Maguire, Evidence of Guilt § 2.062 (1959). This is not to say that short of jail or torture any sanction is permissible in any case; policy and history alike may impose sharp limits. See, *e. g.,*

---

an examination of the scope of the privilege in state cases as well." *Ante,* p. 463. It is also inconsistent with *Malloy* itself, in which extension of the Fifth Amendment to the States rested in part on the view that the Due Process Clause restriction on state confessions has in recent years been "the same standard" as that imposed in federal prosecutions assertedly by the Fifth Amendment. 378 U. S., at 7.

[9] I lay aside *Escobedo* itself; it contains no reasoning or even general conclusions addressed to the Fifth Amendment and indeed its citation in this regard seems surprising in view of *Escobedo's* primary reliance on the Sixth Amendment.

*Griffin* v. *California,* 380 U. S. 609. However, the Court's unspoken assumption that *any* pressure violates the privilege is not supported by the precedents and it has failed to show why the Fifth Amendment prohibits that relatively mild pressure the Due Process Clause permits.

The Court appears similarly wrong in thinking that precise knowledge of one's rights is a settled prerequisite under the Fifth Amendment to the loss of its protections. A number of lower federal court cases have held that grand jury witnesses need not always be warned of their privilege, *e. g., United States* v. *Scully,* 225 F. 2d 113, 116, and Wigmore states this to be the better rule for trial witnesses. See 8 Wigmore, Evidence § 2269 (McNaughton rev. 1961). Cf. *Henry* v. *Mississippi,* 379 U. S. 443, 451–452 (waiver of constitutional rights by counsel despite defendant's ignorance held allowable). No Fifth Amendment precedent is cited for the Court's contrary view. There might of course be reasons apart from Fifth Amendment precedent for requiring warning or any other safeguard on questioning but that is a different matter entirely. See *infra,* pp. 516–517.

A closing word must be said about the Assistance of Counsel Clause of the Sixth Amendment, which is never expressly relied on by the Court but whose judicial precedents turn out to be linchpins of the confession rules announced today. To support its requirement of a knowing and intelligent waiver, the Court cites *Johnson* v. *Zerbst,* 304 U. S. 458, *ante,* p. 475; appointment of counsel for the indigent suspect is tied to *Gideon* v. *Wainwright,* 372 U. S. 335, and *Douglas* v. *California,* 372 U. S. 353, *ante,* p. 473; the silent-record doctrine is borrowed from *Carnley* v. *Cochran,* 369 U. S. 506, *ante,* p. 475, as is the right to an express offer of counsel, *ante,* p. 471. All these cases imparting glosses to the Sixth Amendment concerned counsel at trial or on appeal. While the Court finds no pertinent difference between judicial proceedings and police interrogation, I believe

the differences are so vast as to disqualify wholly the Sixth Amendment precedents as suitable analogies in the present cases.[10]

The only attempt in this Court to carry the right to counsel into the station house occurred in *Escobedo,* the Court repeating several times that that stage was no less "critical" than trial itself. See 378 U. S., 485–488. This is hardly persuasive when we consider that a grand jury inquiry, the filing of a certiorari petition, and certainly the purchase of narcotics by an undercover agent from a prospective defendant may all be equally "critical" yet provision of counsel and advice on that score have never been thought compelled by the Constitution in such cases. The sound reason why this right is so freely extended for a criminal trial is the severe injustice risked by confronting an untrained defendant with a range of technical points of law, evidence, and tactics familiar to the prosecutor but not to himself. This danger shrinks markedly in the police station where indeed the lawyer in fulfilling his professional responsibilities of necessity may become an obstacle to truthfinding. See *infra,* n. 12. The Court's summary citation of the Sixth Amendment cases here seems to me best described as "the domino method of constitutional adjudication . . . wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation." Friendly, *supra,* n. 10, at 950.

### III. POLICY CONSIDERATIONS.

Examined as an expression of public policy, the Court's new regime proves so dubious that there can be no due

---

[10] Since the Court conspicuously does not assert that the Sixth Amendment itself warrants its new police-interrogation rules, there is no reason now to draw out the extremely powerful historical and precedential evidence that the Amendment will bear no such meaning. See generally Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif. L. Rev. 929, 943–948 (1965).

compensation for its weakness in constitutional law. The foregoing discussion has shown, I think, how mistaken is the Court in implying that the Constitution has struck the balance in favor of the approach the Court takes. *Ante,* p. 479. Rather, precedent reveals that the Fourteenth Amendment in practice has been construed to strike a different balance, that the Fifth Amendment gives the Court little solid support in this context, and that the Sixth Amendment should have no bearing at all. Legal history has been stretched before to satisfy deep needs of society. In this instance, however, the Court has not and cannot make the powerful showing that its new rules are plainly desirable in the context of our society, something which is surely demanded before those rules are engrafted onto the Constitution and imposed on every State and county in the land.

Without at all subscribing to the generally black picture of police conduct painted by the Court, I think it must be frankly recognized at the outset that police questioning allowable under due process precedents may inherently entail some pressure on the suspect and may seek advantage in his ignorance or weaknesses. The atmosphere and questioning techniques, proper and fair though they be, can in themselves exert a tug on the suspect to confess, and in this light "[t]o speak of any confessions of crime made after arrest as being 'voluntary' or 'uncoerced' is somewhat inaccurate, although traditional. A confession is wholly and incontestably voluntary only if a guilty person gives himself up to the law and becomes his own accuser." *Ashcraft* v. *Tennessee,* 322 U. S. 143, 161 (Jackson, J., dissenting). Until today, the role of the Constitution has been only to sift out *undue* pressure, not to assure spontaneous confessions.[11]

---

[11] See *supra,* n. 4, and text. Of course, the use of terms like voluntariness involves questions of law and terminology quite as much as questions of fact. See *Collins* v. *Beto,* 348 F. 2d 823, 832 (concurring opinion); Bator & Vorenberg, *supra,* n. 4, at 72–73.

The Court's new rules aim to offset these minor pressures and disadvantages intrinsic to any kind of police interrogation. The rules do not serve due process interests in preventing blatant coercion since, as I noted earlier, they do nothing to contain the policeman who is prepared to lie from the start. The rules work for reliability in confessions almost only in the Pickwickian sense that they can prevent some from being given at all.[12] In short, the benefit of this new regime is simply to lessen or wipe out the inherent compulsion and inequalities to which the Court devotes some nine pages of description. *Ante,* pp. 448–456.

What the Court largely ignores is that its rules impair, if they will not eventually serve wholly to frustrate, an instrument of law enforcement that has long and quite reasonably been thought worth the price paid for it.[13] There can be little doubt that the Court's new code would markedly decrease the number of confessions. To warn the suspect that he may remain silent and remind him that his confession may be used in court are minor obstructions. To require also an express waiver by the suspect and an end to questioning whenever he demurs

---

[12] The Court's vision of a lawyer "mitigat[ing] the dangers of untrustworthiness" (*ante,* p. 470) by witnessing coercion and assisting accuracy in the confession is largely a fancy; for if counsel arrives, there is rarely going to be a police station confession. *Watts* v. *Indiana,* 338 U. S. 49, 59 (separate opinion of Jackson, J.): "[A]ny lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." See Enker & Elsen, Counsel for the Suspect, 49 Minn. L. Rev. 47, 66–68 (1964).

[13] This need is, of course, what makes so misleading the Court's comparison of a probate judge readily setting aside as involuntary the will of an old lady badgered and beleaguered by the new heirs. *Ante,* pp. 457–458, n. 26. With wills, there is no public interest save in a totally free choice; with confessions, the solution of crime is a countervailing gain, however the balance is resolved.

must heavily handicap questioning. And to suggest or provide counsel for the suspect simply invites the end of the interrogation. See, *supra,* n. 12.

How much harm this decision will inflict on law enforcement cannot fairly be predicted with accuracy. Evidence on the role of confessions is notoriously incomplete, see Developments, *supra,* n. 2, at 941–944, and little is added by the Court's reference to the FBI experience and the resources believed wasted in interrogation. See *infra,* n. 19, and text. We do know that some crimes cannot be solved without confessions, that ample expert testimony attests to their importance in crime control,[14] and that the Court is taking a real risk with society's welfare in imposing its new regime on the country. The social costs of crime are too great to call the new rules anything but a hazardous experimentation.

While passing over the costs and risks of its experiment, the Court portrays the evils of normal police questioning in terms which I think are exaggerated. Albeit stringently confined by the due process standards interrogation is no doubt often inconvenient and unpleasant for the suspect. However, it is no less so for a man to be arrested and jailed, to have his house searched, or to stand trial in court, yet all this may properly happen to the most innocent given probable cause, a warrant, or an indictment. Society has always paid a stiff price for law and order, and peaceful interrogation is not one of the dark moments of the law.

This brief statement of the competing considerations seems to me ample proof that the Court's preference is highly debatable at best and therefore not to be read into

---

[14] See, *e. g.,* the voluminous citations to congressional committee testimony and other sources collected in *Culombe* v. *Connecticut,* 367 U. S. 568, 578–579 (Frankfurter, J., announcing the Court's judgment and an opinion).

the Constitution. However, it may make the analysis more graphic to consider the actual facts of one of the four cases reversed by the Court. *Miranda* v. *Arizona* serves best, being neither the hardest nor easiest of the four under the Court's standards.[15]

On March 3, 1963, an 18-year-old girl was kidnapped and forcibly raped near Phoenix, Arizona. Ten days later, on the morning of March 13, petitioner Miranda was arrested and taken to the police station. At this time Miranda was 23 years old, indigent, and educated to the extent of completing half the ninth grade. He had "an emotional illness" of the schizophrenic type, according to the doctor who eventually examined him; the doctor's report also stated that Miranda was "alert and oriented as to time, place, and person," intelligent within normal limits, competent to stand trial, and sane within the legal definition. At the police station, the victim picked Miranda out of a lineup, and two officers then took him into a separate room to interrogate him, starting about 11:30 a. m. Though at first denying his guilt, within a short time Miranda gave a detailed oral confession and then wrote out in his own hand and signed a brief statement admitting and describing the crime. All this was accomplished in two hours or less without any force, threats or promises and—I will assume this though the record is uncertain, *ante,* 491–492 and nn. 66–67—without any effective warnings at all.

Miranda's oral and written confessions are now held inadmissible under the Court's new rules. One is entitled to feel astonished that the Constitution can be read to produce this result. These confessions were ob-

---

[15] In *Westover,* a seasoned criminal was practically given the Court's full complement of warnings and did not heed them. The *Stewart* case, on the other hand, involves long detention and successive questioning. In *Vignera,* the facts are complicated and the record somewhat incomplete.

tained during brief, daytime questioning conducted by two officers and unmarked by any of the traditional indicia of coercion. They assured a conviction for a brutal and unsettling crime, for which the police had and quite possibly could obtain little evidence other than the victim's identifications, evidence which is frequently unreliable. There was, in sum, a legitimate purpose, no perceptible unfairness, and certainly little risk of injustice in the interrogation. Yet the resulting confessions, and the responsible course of police practice they represent, are to be sacrificed to the Court's own finespun conception of fairness which I seriously doubt is shared by many thinking citizens in this country.[16]

The tenor of judicial opinion also falls well short of supporting the Court's new approach. Although *Escobedo* has widely been interpreted as an open invitation to lower courts to rewrite the law of confessions, a significant heavy majority of the state and federal decisions in point have sought quite narrow interpretations.[17] Of

---

[16] "[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." *Snyder* v. *Massachusetts*, 291 U. S. 97, 122 (Cardozo, J.).

[17] A narrow reading is given in: *United States* v. *Robinson*, 354 F. 2d 109 (C. A. 2d Cir.); *Davis* v. *North Carolina*, 339 F. 2d 770 (C. A. 4th Cir.); *Edwards* v. *Holman*, 342 F. 2d 679 (C. A. 5th Cir.); *United States ex rel. Townsend* v. *Ogilvie*, 334 F. 2d 837 (C. A. 7th Cir.); *People* v. *Hartgraves*, 31 Ill. 2d 375, 202 N. E. 2d 33; *State* v. *Fox*, —— Iowa ——, 131 N. W. 2d 684; *Rowe* v. *Commonwealth*, 394 S. W. 2d 751 (Ky.); *Parker* v. *Warden*, 236 Md. 236, 203 A. 2d 418; *State* v. *Howard*, 383 S. W. 2d 701 (Mo.); *Bean* v. *State*, —— Nev. ——, 398 P. 2d 251; *State* v. *Hodgson*, 44 N. J. 151, 207 A. 2d 542; *People* v. *Gunner*, 15 N. Y. 2d 226, 205 N. E. 2d 852; *Commonwealth ex rel. Linde* v. *Maroney*, 416 Pa. 331, 206 A. 2d 288; *Browne* v. *State*, 24 Wis. 2d 491, 131 N. W. 2d 169.

An ample reading is given in: *United States ex rel. Russo* v. *New Jersey*, 351 F. 2d 429 (C. A. 3d Cir.); *Wright* v. *Dickson*,

the courts that have accepted the invitation, it is hard to know how many have felt compelled by their best guess as to this Court's likely construction; but none of the state decisions saw fit to rely on the state privilege against self-incrimination, and no decision at all has gone as far as this Court goes today.[18]

It is also instructive to compare the attitude in this case of those responsible for law enforcement with the official views that existed when the Court undertook three major revisions of prosecutorial practice prior to this case, *Johnson* v. *Zerbst*, 304 U. S. 458, *Mapp* v. *Ohio*, 367 U. S. 643, and *Gideon* v. *Wainwright*, 372 U. S. 335. In *Johnson*, which established that appointed counsel must be offered the indigent in federal criminal trials, the Federal Government all but conceded the basic issue, which had in fact been recently fixed as Department of Justice policy. See Beaney, Right to Counsel 29–30, 36–42 (1955). In *Mapp*, which imposed the exclusionary rule on the States for Fourth Amendment violations, more than half of the States had themselves already adopted some such rule. See 367 U. S., at 651. In *Gideon*, which extended *Johnson* v. *Zerbst* to the States, an *amicus* brief was filed by 22 States and Commonwealths urging that course; only two States besides that of the respondent came forward to protest. See 372 U. S., at 345. By contrast, in this case new restrictions on police

336 F. 2d 878 (C. A. 9th Cir.); *People* v. *Dorado*, 62 Cal. 2d 338, 398 P. 2d 361; *State* v. *Dufour*, —— R. I. ——, 206 A. 2d 82; *State* v. *Neely*, 239 Ore. 487, 395 P. 2d 557, modified, 398 P. 2d 482.

The cases in both categories are those readily available; there are certainly many others.

[18] For instance, compare the requirements of the catalytic case of *People* v. *Dorado*, 62 Cal. 2d 338, 398 P. 2d 361, with those laid down today. See also Traynor, The Devils of Due Process in Criminal Detection, Detention, and Trial, 33 U. Chi. L. Rev. 657, 670.

questioning have been opposed by the United States and in an *amicus* brief signed by 27 States and Commonwealths, not including the three other States which are parties. No State in the country has urged this Court to impose the newly announced rules, nor has any State chosen to go nearly so far on its own.

The Court in closing its general discussion invokes the practice in federal and foreign jurisdictions as lending weight to its new curbs on confessions for all the States. A brief résumé will suffice to show that none of these jurisdictions has struck so one-sided a balance as the Court does today. Heaviest reliance is placed on the FBI practice. Differing circumstances may make this comparison quite untrustworthy,[19] but in any event the FBI falls sensibly short of the Court's formalistic rules. For example, there is no indication that FBI agents must obtain an affirmative "waiver" before they pursue their questioning. Nor is it clear that one invoking his right to silence may not be prevailed upon to change his mind. And the warning as to appointed counsel apparently indicates only that one will be assigned by the judge when the suspect appears before him; the thrust of the Court's rules is to induce the suspect to obtain appointed counsel before continuing the interview. See *ante,* pp. 484–486. Apparently American military practice, briefly mentioned by the Court, has these same limits and is still less favorable to the suspect than the FBI warning, making no mention of appointed counsel. Developments, *supra,* n. 2, at 1084–1089.

The law of the foreign countries described by the Court also reflects a more moderate conception of the rights of

---

[19] The Court's *obiter dictum* notwithstanding, *ante,* p. 486, there is some basis for believing that the staple of FBI criminal work differs importantly from much crime within the ken of local police. The skill and resources of the FBI may also be unusual.

the accused as against those of society when other data are considered. Concededly, the English experience is most relevant. In that country, a caution as to silence but not counsel has long been mandated by the "Judges' Rules," which also place other somewhat imprecise limits on police cross-examination of suspects. However, in the court's discretion confessions can be and apparently quite frequently are admitted in evidence despite disregard of the Judges' Rules, so long as they are found voluntary under the common-law test. Moreover, the check that exists on the use of pretrial statements is counterbalanced by the evident admissibility of fruits of an illegal confession and by the judge's often-used authority to comment adversely on the defendant's failure to testify.[20]

India, Ceylon and Scotland are the other examples chosen by the Court. In India and Ceylon the general ban on police-adduced confessions cited by the Court is subject to a major exception: if evidence is uncovered by police questioning, it is fully admissible at trial along with the confession itself, so far as it relates to the evidence and is not blatantly coerced. See Developments, *supra*, n. 2, at 1106–1110; *Reg.* v. *Ramasamy* [1965] A. C. 1 (P. C.). Scotland's limits on interrogation do measure up to the Court's; however, restrained comment at trial on the defendant's failure to take the stand is allowed the judge, and in many other respects Scotch law redresses the prosecutor's disadvantage in ways not permitted in this country.[21] The Court ends its survey by imputing

---

[20] For citations and discussion covering each of these points, see Developments, *supra*, n. 2, at 1091–1097, and Enker & Elsen, *supra*, n. 12, at 80 & n. 94.

[21] On comment, see Hardin, Other Answers: Search and Seizure, Coerced Confession, and Criminal Trial in Scotland, 113 U. Pa. L. Rev. 165, 181 and nn. 96–97 (1964). Other examples are less stringent search and seizure rules and no automatic exclusion for violation of them, *id.*, at 167–169; guilt based on majority jury verdicts, *id.*, at 185; and pre-trial discovery of evidence on both sides, *id.*, at 175.

added strength to our privilege against self-incrimination since, by contrast to other countries, it is embodied in a written Constitution. Considering the liberties the Court has today taken with constitutional history and precedent, few will find this emphasis persuasive.

In closing this necessarily truncated discussion of policy considerations attending the new confession rules, some reference must be made to their ironic untimeliness. There is now in progress in this country a massive reexamination of criminal law enforcement procedures on a scale never before witnessed. Participants in this undertaking include a Special Committee of the American Bar Association, under the chairmanship of Chief Judge Lumbard of the Court of Appeals for the Second Circuit; a distinguished study group of the American Law Institute, headed by Professors Vorenberg and Bator of the Harvard Law School; and the President's Commission on Law Enforcement and Administration of Justice, under the leadership of the Attorney General of the United States.[22] Studies are also being conducted by the District of Columbia Crime Commission, the Georgetown Law Center, and by others equipped to do practical research.[23] There are also signs that legislatures in some of the States may be preparing to re-examine the problem before us.[24]

---

[22] Of particular relevance is the ALI's drafting of a Model Code of Pre-Arraignment Procedure, now in its first tentative draft. While the ABA and National Commission studies have wider scope, the former is lending its advice to the ALI project and the executive director of the latter is one of the reporters for the Model Code.

[23] See Brief for the United States in *Westover*, p. 45. The N. Y. Times, June 3, 1966, p. 41 (late city ed.) reported that the Ford Foundation has awarded $1,100,000 for a five-year study of arrests and confessions in New York.

[24] The New York Assembly recently passed a bill to require certain warnings before an admissible confession is taken, though the rules are less strict than are the Court's. N. Y. Times, May 24, 1966, p. 35 (late city ed.).

It is no secret that concern has been expressed lest long-range and lasting reforms be frustrated by this Court's too rapid departure from existing constitutional standards. Despite the Court's disclaimer, the practical effect of the decision made today must inevitably be to handicap seriously sound efforts at reform, not least by removing options necessary to a just compromise of competing interests. Of course legislative reform is rarely speedy or unanimous, though this Court has been more patient in the past.[25] But the legislative reforms when they come would have the vast advantage of empirical data and comprehensive study, they would allow experimentation and use of solutions not open to the courts, and they would restore the initiative in criminal law reform to those forums where it truly belongs.

## IV. CONCLUSIONS.

All four of the cases involved here present express claims that confessions were inadmissible, not because of coercion in the traditional due process sense, but solely because of lack of counsel or lack of warnings concerning counsel and silence. For the reasons stated in this opinion, I would adhere to the due process test and reject the new requirements inaugurated by the Court. On this premise my disposition of each of these cases can be stated briefly.

In two of the three cases coming from state courts, *Miranda* v. *Arizona* (No. 759) and *Vignera* v. *New York* (No. 760), the confessions were held admissible and no other errors worth comment are alleged by petitioners.

---

[25] The Court waited 12 years after *Wolf* v. *Colorado,* 338 U. S. 25, declared privacy against improper state intrusions to be constitutionally safeguarded before it concluded in *Mapp* v. *Ohio,* 367 U. S. 643, that adequate state remedies had not been provided to protect this interest so the exclusionary rule was necessary.

I would affirm in these two cases. The other state case is *California* v. *Stewart* (No. 584), where the state supreme court held the confession inadmissible and reversed the conviction. In that case I would dismiss the writ of certiorari on the ground that no final judgment is before us, 28 U. S. C. § 1257 (1964 ed.); putting aside the new trial open to the State in any event, the confession itself has not even been finally excluded since the California Supreme Court left the State free to show proof of a waiver. If the merits of the decision in *Stewart* be reached, then I believe it should be reversed and the case remanded so the state supreme court may pass on the other claims available to respondent.

In the federal case, *Westover* v. *United States* (No. 761), a number of issues are raised by petitioner apart from the one already dealt with in this dissent. None of these other claims appears to me tenable, nor in this context to warrant extended discussion. It is urged that the confession was also inadmissible because not voluntary even measured by due process standards and because federal-state cooperation brought the *McNabb-Mallory* rule into play under *Anderson* v. *United States,* 318 U. S. 350. However, the facts alleged fall well short of coercion in my view, and I believe the involvement of federal agents in petitioner's arrest and detention by the State too slight to invoke *Anderson.* I agree with the Government that the admission of the evidence now protested by petitioner was at most harmless error, and two final contentions—one involving weight of the evidence and another improper prosecutor comment—seem to me without merit. I would therefore affirm Westover's conviction.

In conclusion: Nothing in the letter or the spirit of the Constitution or in the precedents squares with the heavy-handed and one-sided action that is so precipi-

tously taken by the Court in the name of fulfilling its constitutional responsibilities. The foray which the Court makes today brings to mind the wise and farsighted words of Mr. Justice Jackson in *Douglas* v. *Jeannette,* 319 U. S. 157, 181 (separate opinion): "This Court is forever adding new stories to the temples of constitutional law, and the temples have a way of collapsing when one story too many is added."

MR. JUSTICE WHITE, with whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.

## I.

The proposition that the privilege against self-incrimination forbids in-custody interrogation without the warnings specified in the majority opinion and without a clear waiver of counsel has no significant support in the history of the privilege or in the language of the Fifth Amendment. As for the English authorities and the common-law history, the privilege, firmly established in the second half of the seventeenth century, was never applied except to prohibit compelled judicial interrogations. The rule excluding coerced confessions matured about 100 years later, "[b]ut there is nothing in the reports to suggest that the theory has its roots in the privilege against self-incrimination. And so far as the cases reveal, the privilege, as such, seems to have been given effect only in judicial proceedings, including the preliminary examinations by authorized magistrates." Morgan, The Privilege Against Self-Incrimination, 34 Minn. L. Rev. 1, 18 (1949).

Our own constitutional provision provides that no person "shall be compelled in any criminal case to be a witness against himself." These words, when "[c]onsidered in the light to be shed by grammar and the dictionary . . . appear to signify simply that nobody shall be

compelled to give oral testimony against himself in a criminal proceeding under way in which he is defendant." Corwin, The Supreme Court's Construction of the Self-Incrimination Clause, 29 Mich. L. Rev. 1, 2. And there is very little in the surrounding circumstances of the adoption of the Fifth Amendment or in the provisions of the then existing state constitutions or in state practice which would give the constitutional provision any broader meaning. Mayers, The Federal Witness' Privilege Against Self-Incrimination: Constitutional or Common-Law? 4 American Journal of Legal History 107 (1960). Such a construction, however, was considerably narrower than the privilege at common law, and when eventually faced with the issues, the Court extended the constitutional privilege to the compulsory production of books and papers, to the ordinary witness before the grand jury and to witnesses generally. *Boyd* v. *United States,* 116 U. S. 616, and *Counselman* v. *Hitchcock,* 142 U. S. 547. Both rules had solid support in common-law history, if not in the history of our own constitutional provision.

A few years later the Fifth Amendment privilege was similarly extended to encompass the then well-established rule against coerced confessions: "In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Bram* v. *United States,* 168 U. S. 532, 542. Although this view has found approval in other cases, *Burdeau* v. *McDowell,* 256 U. S. 465, 475; *Powers* v. *United States,* 223 U. S. 303, 313; *Shotwell* v. *United States,* 371 U. S. 341, 347, it has also been questioned, see *Brown* v. *Mississippi,* 297 U. S. 278, 285; *United States* v. *Carignan,*

342 U. S. 36, 41; *Stein* v. *New York,* 346 U. S. 156, 191, n. 35, and finds scant support in either the English or American authorities, see generally *Regina* v. *Scott,* Dears. & Bell 47; 3 Wigmore, Evidence § 823 (3d ed. 1940), at 249 ("a confession is not rejected because of any connection with the *privilege against self-crimina- tion*"), and 250, n. 5 (particularly criticizing *Bram*); 8 Wigmore, Evidence § 2266, at 400–401 (McNaughton rev. 1961). Whatever the source of the rule excluding coerced confessions, it is clear that prior to the application of the privilege itself to state courts, *Malloy* v. *Hogan,* 378 U. S. 1, the admissibility of a confession in a state crim- inal prosecution was tested by the same standards as were applied in federal prosecutions. *Id.,* at 6–7, 10.

*Bram,* however, itself rejected the proposition which the Court now espouses. The question in *Bram* was whether a confession, obtained during custodial interro- gation, had been compelled, and if such interrogation was to be deemed inherently vulnerable the Court's inquiry could have ended there. After examining the English and American authorities, however, the Court declared that:

> "In this court also it has been settled that the mere fact that the confession is made to a police officer, while the accused was under arrest in or out of prison, or was drawn out by his questions, does not necessarily render the confession involuntary, but, as one of the circumstances, such imprisonment or interrogation may be taken into account in deter- mining whether or not the statements of the prisoner were voluntary." 168 U. S., at 558.

In this respect the Court was wholly consistent with prior and subsequent pronouncements in this Court.

Thus prior to *Bram* the Court, in *Hopt* v. *Utah,* 110 U. S. 574, 583–587, had upheld the admissibility of a

confession made to police officers following arrest, the record being silent concerning what conversation had occurred between the officers and the defendant in the short period preceding the confession. Relying on *Hopt,* the Court ruled squarely on the issue in *Sparf and Hansen* v. *United States,* 156 U. S. 51, 55:

> "Counsel for the accused insist that there cannot be a voluntary statement, a free open confession, while a defendant is confined and in irons under an accusation of having committed a capital offence. We have not been referred to any authority in support of that position. It is true that the fact of a prisoner being in custody at the time he makes a confession is a circumstance not to be overlooked, because it bears upon the inquiry whether the confession was voluntarily made or was extorted by threats or violence or made under the influence of fear. But confinement or imprisonment is not in itself sufficient to justify the exclusion of a confession, if it appears to have been voluntary, and was not obtained by putting the prisoner in fear or by promises. Wharton's Cr. Ev. 9th ed. §§ 661, 663, and authorities cited."

Accord, *Pierce* v. *United States,* 160 U. S. 355, 357.

And in *Wilson* v. *United States,* 162 U. S. 613, 623, the Court had considered the significance of custodial interrogation without any antecedent warnings regarding the right to remain silent or the right to counsel. There the defendant had answered questions posed by a Commissioner, who had failed to advise him of his rights, and his answers were held admissible over his claim of involuntariness. "The fact that [a defendant] is in custody and manacled does not necessarily render his statement involuntary, nor is that necessarily the effect of popular excitement shortly preceding. . . . And it is laid down

that it is not essential to the admissibility of a confession that it should appear that the person was warned that what he said would be used against him, but on the contrary, if the confession was voluntary, it is sufficient though it appear that he was not so warned."

Since *Bram*, the admissibility of statements made during custodial interrogation has been frequently reiterated. *Powers* v. *United States*, 223 U. S. 303, cited *Wilson* approvingly and held admissible as voluntary statements the accused's testimony at a preliminary hearing even though he was not warned that what he said might be used against him. Without any discussion of the presence or absence of warnings, presumably because such discussion was deemed unnecessary, numerous other cases have declared that "[t]he mere fact that a confession was made while in the custody of the police does not render it inadmissible," *McNabb* v. *United States*, 318 U. S. 332, 346; accord, *United States* v. *Mitchell*, 322 U. S. 65, despite its having been elicited by police examination, *Wan* v. *United States*, 266 U. S. 1, 14; *United States* v. *Carignan*, 342 U. S. 36, 39. Likewise, in *Crooker* v. *California*, 357 U. S. 433, 437, the Court said that "the bare fact of police 'detention and police examination in private of one in official state custody' does not render involuntary a confession by the one so detained." And finally, in *Cicenia* v. *Lagay*, 357 U. S. 504, a confession obtained by police interrogation after arrest was held voluntary even though the authorities refused to permit the defendant to consult with his attorney. See generally *Culombe* v. *Connecticut*, 367 U. S. 568, 587–602 (opinion of Frankfurter, J.); 3 Wigmore, Evidence § 851, at 313 (3d ed. 1940); see also Joy, Admissibility of Confessions 38, 46 (1842).

Only a tiny minority of our judges who have dealt with the question, including today's majority, have considered in-custody interrogation, without more, to be a violation of the Fifth Amendment. And this Court, as

every member knows, has left standing literally thousands of criminal convictions that rested at least in part on confessions taken in the course of interrogation by the police after arrest.

## II.

That the Court's holding today is neither compelled nor even strongly suggested by the language of the Fifth Amendment, is at odds with American and English legal history, and involves a departure from a long line of precedent does not prove either that the Court has exceeded its powers or that the Court is wrong or unwise in its present reinterpretation of the Fifth Amendment. It does, however, underscore the obvious—that the Court has not discovered or found the law in making today's decision, nor has it derived it from some irrefutable sources; what it has done is to make new law and new public policy in much the same way that it has in the course of interpreting other great clauses of the Constitution.[1]  This is what the Court historically has done.  Indeed, it is what it must do and will continue to do until and unless there is some fundamental change in the constitutional distribution of governmental powers.

But if the Court is here and now to announce new and fundamental policy to govern certain aspects of our affairs, it is wholly legitimate to examine the mode of this or any other constitutional decision in this Court and to inquire into the advisability of its end product in terms of the long-range interest of the country.  At the very least the Court's text and reasoning should withstand analysis and be a fair exposition of the constitutional provision which its opinion interprets.  De-

---

[1] Of course the Court does not deny that it is departing from prior precedent; it expressly overrules *Crooker* and *Cicenia, ante,* at 479, n. 48, and it acknowledges that in the instant "cases we might not find the defendants' statements to have been involuntary in traditional terms," *ante,* at 457.

cisions like these cannot rest alone on syllogism, metaphysics or some ill-defined notions of natural justice, although each will perhaps play its part. In proceeding to such constructions as it now announces, the Court should also duly consider all the factors and interests bearing upon the cases, at least insofar as the relevant materials are available; and if the necessary considerations are not treated in the record or obtainable from some other reliable source, the Court should not proceed to formulate fundamental policies based on speculation alone.

## III.

First, we may inquire what are the textual and factual bases of this new fundamental rule. To reach the result announced on the grounds it does, the Court must stay within the confines of the Fifth Amendment, which forbids self-incrimination only if *compelled.* Hence the core of the Court's opinion is that because of the "compulsion inherent in custodial surroundings, no statement obtained from [a] defendant [in custody] can truly be the product of his free choice," *ante,* at 458, absent the use of adequate protective devices as described by the Court. However, the Court does not point to any sudden inrush of new knowledge requiring the rejection of 70 years' experience. Nor does it assert that its novel conclusion reflects a changing consensus among state courts, see *Mapp* v. *Ohio,* 367 U. S. 643, or that a succession of cases had steadily eroded the old rule and proved it unworkable, see *Gideon* v. *Wainwright,* 372 U. S. 335. Rather than asserting new knowledge, the Court concedes that it cannot truly know what occurs during custodial questioning, because of the innate secrecy of such proceedings. It extrapolates a picture of what it conceives to be the norm from police investigatorial manuals, published in 1959 and 1962 or earlier, without any attempt to allow for adjustments in police practices that may

have occurred in the wake of more recent decisions of state appellate tribunals or this Court. But even if the relentless application of the described procedures could lead to involuntary confessions, it most assuredly does not follow that each and every case will disclose this kind of interrogation or this kind of consequence.[2] Insofar as appears from the Court's opinion, it has not examined a single transcript of any police interrogation, let alone the interrogation that took place in any one of these cases which it decides today. Judged by any of the standards for empirical investigation utilized in the social sciences the factual basis for the Court's premise is patently inadequate.

Although in the Court's view in-custody interrogation is inherently coercive, the Court says that the spontaneous product of the coercion of arrest and detention is still to be deemed voluntary. An accused, arrested on probable cause, may blurt out a confession which will be admissible despite the fact that he is alone and in custody, without any showing that he had any notion of his right to remain silent or of the consequences of his admission. Yet, under the Court's rule, if the police ask him a single question such as "Do you have anything to say?" or "Did you kill your wife?" his response, if there is one, has somehow been compelled, even if the accused has

---

[2] In fact, the type of sustained interrogation described by the Court appears to be the exception rather than the rule. A survey of 399 cases in one city found that in almost half of the cases the interrogation lasted less than 30 minutes. Barrett, Police Practices and the Law—From Arrest to Release or Charge, 50 Calif. L. Rev. 11, 41–45 (1962). Questioning tends to be confused and sporadic and is usually concentrated on confrontations with witnesses or new items of evidence, as these are obtained by officers conducting the investigation. See generally LaFave, Arrest: The Decision to Take a Suspect into Custody 386 (1965); ALI, A Model Code of Pre-Arraignment Procedure, Commentary § 5.01, at 170, n. 4 (Tent. Draft No. 1, 1966).

been clearly warned of his right to remain silent. Common sense informs us to the contrary. While one may say that the response was "involuntary" in the sense the question provoked or was the occasion for the response and thus the defendant was induced to speak out when he might have remained silent if not arrested and not questioned, it is patently unsound to say the response is compelled.

Today's result would not follow even if it were agreed that to some extent custodial interrogation is inherently coercive. See *Ashcraft* v. *Tennessee,* 322 U. S. 143, 161 (Jackson, J., dissenting). The test has been whether the totality of circumstances deprived the defendant of a "free choice to admit, to deny, or to refuse to answer," *Lisenba* v. *California,* 314 U. S. 219, 241, and whether physical or psychological coercion was of such a degree that "the defendant's will was overborne at the time he confessed," *Haynes* v. *Washington,* 373 U. S. 503, 513; *Lynumn* v. *Illinois,* 372 U. S. 528, 534. The duration and nature of incommunicado custody, the presence or absence of advice concerning the defendant's constitutional rights, and the granting or refusal of requests to communicate with lawyers, relatives or friends have all been rightly regarded as important data bearing on the basic inquiry. See, *e. g., Ashcraft* v. *Tennessee,* 322 U. S. 143; *Haynes* v. *Washington,* 373 U. S. 503.[3]

---

[3] By contrast, the Court indicates that in applying this new rule it "will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given." *Ante,* at 468. The reason given is that assessment of the knowledge of the defendant based on information as to age, education, intelligence, or prior contact with authorities can never be more than speculation, while a warning is a clear-cut fact. But the officers' claim that they gave the requisite warnings may be disputed, and facts respecting the defendant's prior experience may be undisputed and be of such a nature as to virtually preclude any doubt that the defendant knew of his rights. See *United States* v. *Bolden,* 355 F. 2d 453

But it has never been suggested, until today, that such questioning was so coercive and accused persons so lacking in hardihood that the very first response to the very first question following the commencement of custody must be conclusively presumed to be the product of an overborne will.

If the rule announced today were truly based on a conclusion that all confessions resulting from custodial interrogation are coerced, then it would simply have no rational foundation. Compare *Tot* v. *United States,* 319 U. S. 463, 466; *United States* v. *Romano,* 382 U. S. 136. *A fortiori* that would be true of the extension of the rule to exculpatory statements, which the Court effects after a brief discussion of why, in the Court's view, they must be deemed incriminatory but without any discussion of why they must be deemed coerced. See *Wilson* v. *United States,* 162 U. S. 613, 624. Even if one were to postulate that the Court's concern is not that all confessions induced by police interrogation are coerced but rather that some such confessions are coerced and present judicial procedures are believed to be inadequate to identify the confessions that are coerced and those that are not, it would still not be essential to impose the rule that the Court has now fashioned. Transcripts or observers could be required, specific time limits, tailored to fit the cause, could be imposed, or other devices could be utilized to reduce the chances that otherwise indiscernible coercion will produce an inadmissible confession.

On the other hand, even if one assumed that there was an adequate factual basis for the conclusion that all confessions obtained during in-custody interrogation are the product of compulsion, the rule propounded by

(C. A. 7th Cir. 1965), petition for cert. pending No. 1146, O. T. 1965 (Secret Service agent); *People* v. *Du Bont,* 235 Cal. App. 2d 844, 45 Cal. Rptr. 717, pet. for cert. pending No. 1053, Misc., O. T. 1965 (former police officer).

the Court would still be irrational, for, apparently, it is only if the accused is also warned of his right to counsel and waives both that right and the right against self-incrimination that the inherent compulsiveness of interrogation disappears. But if the defendant may not answer without a warning a question such as "Where were you last night?" without having his answer be a compelled one, how can the Court ever accept his negative answer to the question of whether he wants to consult his retained counsel or counsel whom the court will appoint? And why if counsel is present and the accused nevertheless confesses, or counsel tells the accused to tell the truth, and that is what the accused does, is the situation any less coercive insofar as the accused is concerned? The Court apparently realizes its dilemma of foreclosing questioning without the necessary warnings but at the same time permitting the accused, sitting in the same chair in front of the same policemen, to waive his right to consult an attorney. It expects, however, that the accused will not often waive the right; and if it is claimed that he has, the State faces a severe, if not impossible burden of proof.

All of this makes very little sense in terms of the compulsion which the Fifth Amendment proscribes. That amendment deals with compelling the accused himself. It is his free will that is involved. Confessions and incriminating admissions, as such, are not forbidden evidence; only those which are compelled are banned. I doubt that the Court observes these distinctions today. By considering any answers to any interrogation to be compelled regardless of the content and course of examination and by escalating the requirements to prove waiver, the Court not only prevents the use of compelled confessions but for all practical purposes forbids interrogation except in the presence of counsel. That is, instead of confining itself to protection of the right against com-

pelled self-incrimination the Court has created a limited Fifth Amendment right to counsel—or, as the Court expresses it, a "need for counsel to protect the Fifth Amendment privilege . . . ." *Ante,* at 470. The focus then is not on the will of the accused but on the will of counsel and how much influence he can have on the accused. Obviously there is no warrant in the Fifth Amendment for thus installing counsel as the arbiter of the privilege.

In sum, for all the Court's expounding on the menacing atmosphere of police interrogation procedures, it has failed to supply any foundation for the conclusions it draws or the measures it adopts.

## IV.

Criticism of the Court's opinion, however, cannot stop with a demonstration that the factual and textual bases for the rule it propounds are, at best, less than compelling. Equally relevant is an assessment of the rule's consequences measured against community values. The Court's duty to assess the consequences of its action is not satisfied by the utterance of the truth that a value of our system of criminal justice is "to respect the inviolability of the human personality" and to require government to produce the evidence against the accused by its own independent labors. *Ante,* at 460. More than the human dignity of the accused is involved; the human personality of others in the society must also be preserved. Thus the values reflected by the privilege are not the sole desideratum; society's interest in the general security is of equal weight.

The obvious underpinning of the Court's decision is a deep-seated distrust of all confessions. As the Court declares that the accused may not be interrogated without counsel present, absent a waiver of the right to counsel, and as the Court all but admonishes the lawyer to

advise the accused to remain silent, the result adds up to a judicial judgment that evidence from the accused should not be used against him in any way, whether compelled or not. This is the not so subtle overtone of the opinion—that it is inherently wrong for the police to gather evidence from the accused himself. And this is precisely the nub of this dissent. I see nothing wrong or immoral, and certainly nothing unconstitutional, in the police's asking a suspect whom they have reasonable cause to arrest whether or not he killed his wife or in confronting him with the evidence on which the arrest was based, at least where he has been plainly advised that he may remain completely silent, see *Escobedo* v. *Illinois,* 378 U. S. 478, 499 (dissenting opinion). Until today, "the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence." *Brown* v. *Walker,* 161 U. S. 591, 596; see also *Hopt* v. *Utah,* 110 U. S. 574, 584–585. Particularly when corroborated, as where the police have confirmed the accused's disclosure of the hiding place of implements or fruits of the crime, such confessions have the highest reliability and significantly contribute to the certitude with which we may believe the accused is guilty. Moreover, it is by no means certain that the process of confessing is injurious to the accused. To the contrary it may provide psychological relief and enhance the prospects for rehabilitation.

This is not to say that the value of respect for the inviolability of the accused's individual personality should be accorded no weight or that all confessions should be indiscriminately admitted. This Court has long read the Constitution to proscribe compelled confessions, a salutary rule from which there should be no retreat. But I see no sound basis, factual or otherwise, and the Court gives none, for concluding that the present rule against the receipt of coerced confessions is inadequate for the

task of sorting out inadmissible evidence and must be replaced by the *per se* rule which is now imposed. Even if the new concept can be said to have advantages of some sort over the present law, they are far outweighed by its likely undesirable impact on other very relevant and important interests.

The most basic function of any government is to provide for the security of the individual and of his property. *Lanzetta* v. *New Jersey,* 306 U. S. 451, 455. These ends of society are served by the criminal laws which for the most part are aimed at the prevention of crime. Without the reasonably effective performance of the task of preventing private violence and retaliation, it is idle to talk about human dignity and civilized values.

The modes by which the criminal laws serve the interest in general security are many. First the murderer who has taken the life of another is removed from the streets, deprived of his liberty and thereby prevented from repeating his offense. In view of the statistics on recidivism in this country [4] and of the number of instances

---

[4] Precise statistics on the extent of recidivism are unavailable, in part because not all crimes are solved and in part because criminal records of convictions in different jurisdictions are not brought together by a central data collection agency. Beginning in 1963, however, the Federal Bureau of Investigation began collating data on "Careers in Crime," which it publishes in its Uniform Crime Reports. Of 92,869 offenders processed in 1963 and 1964, 76% had a prior arrest record on some charge. Over a period of 10 years the group had accumulated 434,000 charges. FBI, Uniform Crime Reports—1964, 27–28. In 1963 and 1964 between 23% and 25% of all offenders sentenced in 88 federal district courts (excluding the District Court for the District of Columbia) whose criminal records were reported had previously been sentenced to a term of imprisonment of 13 months or more. Approximately an additional 40% had a prior record less than prison (juvenile record, probation record, etc.). Administrative Office of the United States Courts, Federal Offenders in the United States District Courts: 1964, x, 36 (hereinafter cited as Federal Offenders: 1964); Administrative

540

in which apprehension occurs only after repeated offenses, no one can sensibly claim that this aspect of the criminal law does not prevent crime or contribute significantly to the personal security of the ordinary citizen.

Secondly, the swift and sure apprehension of those who refuse to respect the personal security and dignity of their neighbor unquestionably has its impact on others who might be similarly tempted. That the criminal law is wholly or partly ineffective with a segment of the population or with many of those who have been apprehended and convicted is a very faulty basis for concluding that it is not effective with respect to the great bulk of our citizens or for thinking that without the criminal laws,

Office of the United States Courts, Federal Offenders in the United States District Courts: 1963, 25–27 (hereinafter cited as Federal Offenders: 1963). During the same two years in the District Court for the District of Columbia between 28% and 35% of those sentenced had prior prison records and from 37% to 40% had a prior record less than prison. Federal Offenders: 1964, xii, 64, 66; Administrative Office of the United States Courts, Federal Offenders in the United States District Court for the District of Columbia: 1963, 8, 10 (hereinafter cited as District of Columbia Offenders: 1963).

A similar picture is obtained if one looks at the subsequent records of those released from confinement. In 1964, 12.3% of persons on federal probation had their probation revoked because of the commission of major violations (defined as one in which the probationer has been committed to imprisonment for a period of 90 days or more, been placed on probation for over one year on a new offense, or has absconded with felony charges outstanding). Twenty-three and two-tenths percent of parolees and 16.9% of those who had been mandatorily released after service of a portion of their sentence likewise committed major violations. Reports of the Proceedings of the Judicial Conference of the United States and Annual Report of the Director of the Administrative Office of the United States Courts: 1965, 138. See also Mandel et al., Recidivism Studied and Defined, 56 J. Crim. L., C. & P. S. 59 (1965) (within five years of release 62.33% of sample had committed offenses placing them in recidivist category).

or in the absence of their enforcement, there would be no increase in crime. Arguments of this nature are not borne out by any kind of reliable evidence that I have seen to this date.

Thirdly, the law concerns itself with those whom it has confined. The hope and aim of modern penology, fortunately, is as soon as possible to return the convict to society a better and more law-abiding man than when he left. Sometimes there is success, sometimes failure. But at least the effort is made, and it should be made to the very maximum extent of our present and future capabilities.

The rule announced today will measurably weaken the ability of the criminal law to perform these tasks. It is a deliberate calculus to prevent interrogations, to reduce the incidence of confessions and pleas of guilty and to increase the number of trials.[5] Criminal trials, no

---

[5] Eighty-eight federal district courts (excluding the District Court for the District of Columbia) disposed of the cases of 33,381 criminal defendants in 1964. Only 12.5% of those cases were actually tried. Of the remaining cases, 89.9% were terminated by convictions upon pleas of guilty and 10.1% were dismissed. Stated differently, approximately 90% of all convictions resulted from guilty pleas. Federal Offenders: 1964, *supra,* note 4, 3–6. In the District Court for the District of Columbia a higher percentage, 27%, went to trial, and the defendant pleaded guilty in approximately 78% of the cases terminated prior to trial. *Id.,* at 58–59. No reliable statistics are available concerning the percentage of cases in which guilty pleas are induced because of the existence of a confession or of physical evidence unearthed as a result of a confession. Undoubtedly the number of such cases is substantial.

Perhaps of equal significance is the number of instances of known crimes which are not solved. In 1964, only 388,946, or 23.9% of 1,626,574 serious known offenses were cleared. The clearance rate ranged from 89.8% for homicides to 18.7% for larceny. FBI, Uniform Crime Reports—1964, 20–22, 101. Those who would replace interrogation as an investigatorial tool by modern scientific investigation techniques significantly overestimate the effectiveness of present procedures, even when interrogation is included.

matter how efficient the police are, are not sure bets for the prosecution, nor should they be if the evidence is not forthcoming. Under the present law, the prosecution fails to prove its case in about 30% of the criminal cases actually tried in the federal courts. See Federal Offenders: 1964, *supra,* note 4, at 6 (Table 4), 59 (Table 1); Federal Offenders: 1963, *supra,* note 4, at 5 (Table 3); District of Columbia Offenders: 1963, *supra,* note 4, at 2 (Table 1). But it is something else again to remove from the ordinary criminal case all those confessions which heretofore have been held to be free and voluntary acts of the accused and to thus establish a new constitutional barrier to the ascertainment of truth by the judicial process. There is, in my view, every reason to believe that a good many criminal defendants who otherwise would have been convicted on what this Court has previously thought to be the most satisfactory kind of evidence will now, under this new version of the Fifth Amendment, either not be tried at all or will be acquitted if the State's evidence, minus the confession, is put to the test of litigation.

I have no desire whatsoever to share the responsibility for any such impact on the present criminal process.

In some unknown number of cases the Court's rule will return a killer, a rapist or other criminal to the streets and to the environment which produced him, to repeat his crime whenever it pleases him. As a consequence, there will not be a gain, but a loss, in human dignity. The real concern is not the unfortunate consequences of this new decision on the criminal law as an abstract, disembodied series of authoritative proscriptions, but the impact on those who rely on the public authority for protection and who without it can only engage in violent self-help with guns, knives and the help of their neighbors similarly inclined. There is, of

course, a saving factor: the next victims are uncertain, unnamed and unrepresented in this case.

Nor can this decision do other than have a corrosive effect on the criminal law as an effective device to prevent crime. A major component in its effectiveness in this regard is its swift and sure enforcement. The easier it is to get away with rape and murder, the less the deterrent effect on those who are inclined to attempt it. This is still good common sense. If it were not, we should posthaste liquidate the whole law enforcement establishment as a useless, misguided effort to control human conduct.

And what about the accused who has confessed or would confess in response to simple, noncoercive questioning and whose guilt could not otherwise be proved? Is it so clear that release is the best thing for him in every case? Has it so unquestionably been resolved that in each and every case it would be better for him not to confess and to return to his environment with no attempt whatsoever to help him? I think not. It may well be that in many cases it will be no less than a callous disregard for his own welfare as well as for the interests of his next victim.

There is another aspect to the effect of the Court's rule on the person whom the police have arrested on probable cause. The fact is that he may not be guilty at all and may be able to extricate himself quickly and simply if he were told the circumstances of his arrest and were asked to explain. This effort, and his release, must now await the hiring of a lawyer or his appointment by the court, consultation with counsel and then a session with the police or the prosecutor. Similarly, where probable cause exists to arrest several suspects, as where the body of the victim is discovered in a house having several residents, compare *Johnson* v. *State,* 238 Md. 140, 207 A. 2d 643 (1965), cert. denied, 382 U. S. 1013, it will often

be true that a suspect may be cleared only through the results of interrogation of other suspects. Here too the release of the innocent may be delayed by the Court's rule.

Much of the trouble with the Court's new rule is that it will operate indiscriminately in all criminal cases, regardless of the severity of the crime or the circumstances involved. It applies to every defendant, whether the professional criminal or one committing a crime of momentary passion who is not part and parcel of organized crime. It will slow down the investigation and the apprehension of confederates in those cases where time is of the essence, such as kidnapping, see *Brinegar* v. *United States,* 338 U. S. 160, 183 (Jackson, J., dissenting); *People* v. *Modesto,* 62 Cal. 2d 436, 446, 398 P. 2d 753, 759 (1965), those involving the national security, see *United States* v. *Drummond,* 354 F. 2d 132, 147 (C. A. 2d Cir. 1965) (*en banc*) (espionage case), pet. for cert. pending, No. 1203, Misc., O. T. 1965; cf. *Gessner* v. *United States,* 354 F. 2d 726, 730, n. 10 (C. A. 10th Cir. 1965) (upholding, in espionage case, trial ruling that Government need not submit classified portions of interrogation transcript), and some of those involving organized crime. In the latter context the lawyer who arrives may also be the lawyer for the defendant's colleagues and can be relied upon to insure that no breach of the organization's security takes place even though the accused may feel that the best thing he can do is to cooperate.

At the same time, the Court's *per se* approach may not be justified on the ground that it provides a "bright line" permitting the authorities to judge in advance whether interrogation may safely be pursued without jeopardizing the admissibility of any information obtained as a consequence. Nor can it be claimed that judicial time and effort, assuming that is a relevant consideration,

will be conserved because of the ease of application of the new rule. Today's decision leaves open such questions as whether the accused was in custody, whether his statements were spontaneous or the product of interrogation, whether the accused has effectively waived his rights, and whether nontestimonial evidence introduced at trial is the fruit of statements made during a prohibited interrogation, all of which are certain to prove productive of uncertainty during investigation and litigation during prosecution. For all these reasons, if further restrictions on police interrogation are desirable at this time, a more flexible approach makes much more sense than the Court's constitutional straitjacket which forecloses more discriminating treatment by legislative or rule-making pronouncements.

Applying the traditional standards to the cases before the Court, I would hold these confessions voluntary. I would therefore affirm in Nos. 759, 760, and 761, and reverse in No. 584.